**UNITED STATES of America,
Appellee,**

v.

**Clarissa ASPINALL, Defendant–
Appellant.**

**Docket No. 04–2974–CR.**

United States Court of Appeals,
Second Circuit.

Argued: Oct. 13, 2004.

Decided: Nov. 17, 2004.

Sarah Y. Lai, Assistant United States Attorney, New York, New York (David N. Kelley, United States Attorney for the Southern District of New York, Peter G. Neiman, Assistant United States Attorney, New York, New York, on the brief), for Appellee.

Vida M. Alvy, New York, New York (Alvy & Jacobson, New York, New York, on the brief), for Defendant–Appellant.

Before: KEARSE and CALABRESI, Circuit Judges, and RAKOFF, District Judge *.

KEARSE, Circuit Judge.

Defendant Clarissa Aspinall, who, following her plea of guilty, was convicted of credit card fraud in violation of 18 U.S.C. § 1029 and sentenced principally to a term of probation, appeals from a judgment of the United States District Court for the Southern District of New York, Denny Chin, *Judge*, revoking her probation and sentencing her principally to a nine-month term of imprisonment. The district court found that Aspinall had violated the terms of her probation by, *inter alia*, submitting fraudulent employment information to the United States Probation Department

---

* Honorable Jed S. Rakoff, of the United States District Court for the Southern District of New York, sitting by designation.

("Probation Department" or "Department") and violating the conditions of her home confinement. On appeal, Aspinall contends primarily that she (a) was denied due process and the right of confrontation by the admission of hearsay evidence at her probation revocation hearing, and (b) was denied due process by reason of an ex parte conversation between her probation officer and the district judge prior to that hearing. She also argues that the nine-month term of imprisonment was unreasonably long. Finding no merit in any of her contentions, we affirm.

## I. BACKGROUND

Following her plea of guilty to credit card fraud, Aspinall was sentenced on August 27, 2003, principally to a four-year term of probation, with a special condition of six months' home confinement that permitted her to leave her residence during specified hours in connection with her employment. In order to permit Probation Department verification of Aspinall's compliance with the terms of her home confinement, Aspinall was required, *inter alia*, to submit job descriptions, work itineraries, and employment contracts to the Department.

In December 2003, United States Probation Officer Enid Febus filed a petition with the district court for a warrant to initiate a probation violation proceeding against Aspinall ("Probation Revocation Petition" or "Petition"). The Petition alleged that (1) on or about November 25, 2003, Aspinall had failed to submit a complete and truthful supervision report to the Probation Department and had in fact submitted a fraudulent report; (2) from approximately August 28 through December 22, 2003, Aspinall had failed to answer truthfully inquiries by Febus regarding her employment and had in fact provided misleading information as to her employment and assets; (3) on or about December 6, 2003, Aspinall had failed to comply with court-ordered home confinement conditions; (4) on the same date Aspinall had tampered with her electronic monitoring device, in an attempt to avoid detection of that noncompliance; and (5) from approximately October 5 through November 4, 2003, Aspinall had failed to submit employment verification documents. (*See* Probation Revocation Petition at 4–5.) The Petition described Aspinall's conduct during the four months in which she had been on probation (*see id.* at 2–4) and stated that Aspinall had been "uncooperative and defiant" and that "her actions of submitting false and misleading documentation" indicates "that she has possibly continued her involvement in illegal activity. Her defiance with home confinement clearly demonstrates a disregard to [*sic*] the Court and Criminal Justice System." (*Id.* at 7.) The Petition stated that Chapter 7 of the Sentencing Guidelines ("Guidelines") Manual suggested a range of three-to-nine months' imprisonment for such violations by a defendant such as Aspinall but that, as that Chapter expressed only policy statements, it was not binding on the district court; the Petition stated that under 18 U.S.C. § 3565(a)(2), Aspinall could be resentenced to, *inter alia*, the maximum 10–year term of imprisonment applicable to her credit-card-fraud offense. (*See* Petition at 6.)

The warrant was issued, and an evidentiary hearing was convened on February 26, 2004. As detailed in Part II.B. below, before receiving any evidence at the hearing, the district court stated that it had received a visit that morning from Febus with respect to a matter that was not a charge in the Petition and which would not affect the court's consideration of the charges in the Petition. (*See* Revocation

Hearing Transcript, February 26, 2004 ("Rev. Tr."), at 4–5.)

### A. The Evidence at the Revocation Hearing

At the probation revocation hearing, the government called Febus as a witness and introduced a number of documents in support of the probation revocation charges. With respect to the first two charges, Febus testified, *inter alia*, that Aspinall had claimed in September 2003 to be self-employed; that in November she stated that she was working as an employee of a company called Shard Consulting ("Shard"); and that in December, Aspinall stated that her employment with Shard required her to commute to Connecticut. In support of her claim to be employed by Shard, Aspinall submitted to Febus pay stubs from Shard; handwritten, certified reports by Aspinall (*see, e.g.*, Government Exhibit 9); and a letter dated December 16, 2003, on "Shard Consulting, LLC." letterhead, signed by "Edna Reeves[,] Managing Partner & Project Leader," stating that, commencing December 17, 2003, Aspinall would be required to perform her duties in Stamford, Connecticut (Government Exhibit 5 (the "Shard Letter")).

Febus testified that when she suggested in her December 2003 conversation with Aspinall that Febus would call Shard to verify Aspinall's new assignment in Connecticut (*see* Rev. Tr. 47–48), Aspinall said, "Don't call them because they don't know my status on probation. And if you do, they are going to fire me" (*id.* at 48). After that conversation, Febus performed computerized database searches to determine whether there was any corporation called Shard at 45 Main Street, Suite 309, Brooklyn, New York, the address that was shown on the Shard Letter and that had previously been given for Shard by Aspinall in documents she submitted to the Probation Department and the Department of Justice. Febus testified that her search turned up no company called Shard at that address. Accordingly, Febus thereafter asked an FBI agent, whose other duties required a trip to Brooklyn, to "stop by this location and check . . . if this company existed. . . . And if the company existed . . . to determine whether" what Aspinall had submitted "were true pay stubs." (*Id.* at 21.)

Febus testified that the FBI agent visited the purported Shard address, found there only a small answering service, AI Business Services ("AI"), and obtained from AI two documents (identified at the hearing as Government Exhibits 2 and 3):

Q. Did the FBI agent go to the address at 45 Main Street, suite 309?

A. Yes, they [*sic*] did, on December 19 in the morning.

Q. Did you speak to the FBI agent after the FBI agent went to that address?

A. Yes. She called me and she told me that she had been to the location, that there was not a company called Shard Consulting at the address or the room given, that it was an answering service.

Q. What was the name of the answering service?

A. AI Business Services.

Q. And did the FBI agent describe to you what suite 309 looks like?

A. Yes. She said it was a room that was not too big. It had about five representatives of AI that served as operators answering telephones with telephone equipment on a desk.

Q. Aside from visiting the location, did she do anything else at that location.

A. She returned after [performing her other duties that day] and they handed documents to her.

Q. And what documents were they?

A. They were agreements that were completed by the probationer who would be paying for services to AI.

Q. Has the FBI agent provided you with copies of those documents?

A. She provided me with the originals.

. . . .

Q. What, if anything, did you learn from those documents about the relationship between Shard Consulting and AI Business Services?

(Rev. Tr. 21–23.) At this point, Aspinall's attorney objected:

> MR. BAUM [attorney for Aspinall]: Your Honor, I object to this testimony on several grounds. Number one, it's not demonstrated that Kareese Lindsay or even Clarissa Aspinall is the source of the information on these documents.

(*Id.* at 23; *see also id.* at 8–9 ("Kareese Lindsay" was Aspinall's name prior to a September 2002 court-approved name change.).) Defense counsel continued:

> Secondly, it's hearsay. And while hearsay is permissible at probation hearings, they [*sic*] are permissible only where ... the government demonstrates that they [*sic*] are unable to get the original source before the court.
>
> . . . . [T]here is nothing in this record, nor in the foundation now being laid to demonstrate that my client is the source of this information. So for the officer to tell the Court that this is what the document says and it comes from my client has no basis in fact at this point.
>
> . . . .
>
> . . . . There is an objection to the documents. This is the basis for my objection aside from hearsay. The objection to the documents is it is being offered to show that the information in the docu-

ment comes from my client. It's being offered for its truth.

(*Id.* at 23–24.)

Although Assistant United States Attorney Lai responded that the AI documents were "not being offered for" their "truth" (Rev. Tr. 24), Aspinall's attorney continued with his hearsay objection and argued that the admission of the documents would violate "the defendant's constitutional right of confrontation" (*id.*). The hearsay debate then continued, and defense counsel reiterated his contention that there was a foundation problem:

> Ms. LAI: Your Honor, it is being offered for the falsity [*sic*] of the statements in paragraph 13 [of Government Exhibit 2] and maybe also paragraph 10.
>
> MR. BAUM: That's the point. It is being offered for its truth [*sic*] and there is nothing to show that it comes from Ms. Aspinall. We don't even know if it was written by Ms. Aspinall or under what circumstances it was filled out. We don't know if it's accurate or where the information comes from.
>
> THE COURT: I have it. Let's see where we go.... [T]here is no jury here. So let us proceed and we will see what happens. I have to sort out exactly what it is being offered for, whether indeed it is being offered for the truth. If it is not being offered for the truth, then we don't have a hearsay problem anyway. It's not being offered for the truth in the sense that the government is not taking the position that the information in this document is truthful. That's not the government's position. The government's position is that the information in the document is false.
>
> The other question, though, is, where did this come from, who wrote it? I don't know that that's a hearsay problem.

MR. BAUM: That's a foundation problem because if they can't show it came from Ms. Lindsay or Ms. Aspinall, then why is it being offered? What's the relevancy?

THE COURT: It has her name in it. The question is, who would have submitted something to AI that said, please note, if anyone requests to verify Clarissa Aspinall, please make sure that the social security number is verified, et cetera, et cetera. Who would have had incentive to write this information on this piece of paper and give it to AI? I don't think it's a hearsay problem. I think it's more what does it show. And I think I need to hear all the facts and circumstances. And I'll conclude whether it shows anything. Let's see what happens.

(Rev. Tr. 24–26.) Ultimately, Government Exhibits 2 and 3 were admitted in evidence. (*See id.* at 28–29, 64–65.)

Government Exhibit 2 was an AI document bearing the heading "Customer Service Questionnaire" and calling for details as to how the customer wished certain matters handled. Question 10 read, "If you would like A.I. to provide employment verification services, please include employee name, dates employed, position with company, and salary," and Question 13 asked for any additional information that would assist AI in handling the account. (Government Exhibit 2, at 2.) The handwritten responses on Exhibit 2 included Aspinall's name, social security number, and the following instruction:

If anyone requests to verify Clarissa Aspinall, please make sure SS# is verified, and let them know her hours of employment and that she is paid off the books bi-weekly $1250.00 and her hours are 8 am—8:30 pm and on Saturdays she does an unpaid internship.—> Schwann Mayer is her supervisor.

If anyone requests to speak with her, she is an external consultant that meets with various clients daily, request if want to leave a message or voicemail. (*Id.*)

The AI document introduced as Government Exhibit 3 was a handwritten memorandum from "Aspinall" to "Debra" "Re: Phone call yesterday," stating that "[t]he company is Shard Consulting. Attached is Kareese's authorization to use the card. Please process ASAP." (Government Exhibit 3, at 1.) The attachment read, "I, Kareese Lindsay, do hereby authorize Clara Aspinall to use my credit card on August 28, 2003 for charges by AI Services," and it provided a credit card number, expiration date, and three-digit code. (Government Exhibit 3, at 2.) Aspinall had been permitted to change her name from Kareese Lindsay pursuant to a state-court order in September 2002 (*see* Defense Exhibit A) on the ground that she was a victim of domestic violence and sought to avoid detection by her child's father (*see* Rev. Tr. 9). The order authorized her to use the name "Clarissa Janae Aspinall," "and . . . no other name(s)." (Defense Exhibit A, at 4.)

Febus received the AI documents on Friday, December 19, 2003. (*See* Rev. Tr. 27–28.) On that day, the government applied for a search warrant for Aspinall's home, 1233 Arnow Avenue in the Bronx. (*See id.* at 32–33.) In addition, early on Monday, December 22, probation officers set up a surveillance of Aspinall in light of her representations that she would be working in Connecticut. (*See id.* at 30.) During the surveillance, the officers reported to their supervisor that Aspinall seemed to be driving around New York randomly; Febus promptly called Aspinall's cell phone to ask about the location of her employment. (*See id.* at 30–31.) Aspinall responded that she was on her

way to her employment in Connecticut; however, as the surveillance team observed, she instead went home. (*See id.* at 30–32.)

The requested search warrant for Aspinall's home was issued, and was executed on December 24. Among the documents seized was a payroll record generated by a company called "Paychex," addressed to Shard at 1233 Arnow Avenue in the Bronx, *i.e.*, Aspinall's home. (*See id.* at 32–33.) That document, introduced as Government Exhibit 6, bore the legend "KAREESE LINDSAY DBA SHARD," revealing that Shard was an alter-ego for "Kareese Lindsay," Aspinall's former name which Aspinall had continued to use. (*See also* Defense Exhibit C, an Internal Revenue Service Employer Identification Number Cover Sheet dated November 13, 2003, addressed to "KAREESE LINDSAY" for "KAREESE LINDSAY DBA SHARD CONSULTING.")

The Shard payroll record listed as employees only Aspinall, "Kareese Lindsay," and "Alaisia D'Aguilar" (Aspinall's nine-year-old daughter). (Government Exhibit 6.) "Edna Reeves," signer of the Shard Letter as Shard's purported "Managing Partner & Project Leader," was not listed (*see* Rev. Tr. 34); nor was any adult person listed other than Aspinall. Thus, despite the representation by Aspinall that Shard "d[id]n't know [her] status on probation" and would fire her if it found out (*id.* at 48), the documents revealed that Shard was Aspinall's own company. Febus also testified that no documents were found indicating that Shard itself "ha[d] ever received payments for contract work to other companies." (*Id.* at 55–56.)

As to the Probation Revocation Petition's charges that Aspinall had violated the terms of her home confinement and had tampered with her electronic monitoring device in an attempt to avoid detection of that violation, Febus's testimony may be summarized briefly as follows. On December 6, 2003, Aspinall was required to be in her home by no later than 5:00 p.m. At 4:03 p.m., the electronic device in Aspinall's residence was disconnected; at 4:05 p.m., Aspinall left the house. At 7:12 p.m., she returned, whereupon the unit was plugged in again. Unbeknownst to Aspinall, however, the device contained a battery that permitted it to continue functioning even after being unplugged; thus, her absence from home was recorded. Febus testified that Aspinall, when first confronted about the unauthorized absence, repeatedly denied leaving her residence and denied any unplugging of the monitoring device; she recanted those denials only after learning of the device's battery backup system. Thereafter, Aspinall claimed that the device had been accidentally disconnected by her daughter. Aspinall called her mother as a witness to testify to that effect at the hearing.

### B. *The Decision of the District Court*

In a decision announced from the bench at the end of the revocation hearing, the district court found Aspinall guilty on the first four charges in the Probation Revocation Petition. As to Counts 1 and 2, which alleged that Aspinall had submitted false and misleading information to the Probation Department with regard to her employment, the court found that "Shard [wa]s an utter sham." (Rev. Tr. 73.) It found that "Ms. Edna Reeves," the purported author of the Shard Letter, was "nonexistent," that the Shard Letter was "a fabrication," and that "Aspinall engaged in a scheme to fabricate documents and to create this fictitious employer." (*Id.*)

The court also found Aspinall guilty on Counts 3 and 4, to wit, that she had violated her home confinement conditions and had tampered with the electronic monitor-

ing device in an effort to conceal that violation. (*See id.* at 74–75.) The court found Aspinall not guilty on Count 5, which charged that she had failed to submit required employment documents. The court reasoned that since Shard was . a sham, there were no authentic documents for Aspinall to submit. (*See id.* at 75.)

After allowing a period for psychiatric evaluation of Aspinall, the court sentenced her principally to a nine-month term of imprisonment, to be followed by two years of supervised release. The court stated that it was troubled by the fact that it had "g[i]ve[n] Ms. Aspinall a break" by sentencing her to probation and that she had abused that status by "[f]abricating documents, submitting fabricated documents to the court, [and] trying to commit a fraud on the probation department and the court." (Sentencing Hearing Transcript, May 11, 2004 ("S.Tr."), at 7.) In August 2004, the district court denied a motion by Aspinall for bail pending appeal.

## II. DISCUSSION

On appeal, Aspinall contends principally that the documents obtained from AI, as well as Febus's testimony relating to the FBI agent's visits to AI, were improperly admitted in evidence at her revocation hearing and that the sentence imposed by the court was unreasonably long. She also contends that the ex parte prehearing communication between the court and Febus violated her due process rights. We find no merit in any of her contentions.

### A. *The Admission of the AI Documents*

Aspinall contends that the AI evidence constituted double hearsay from sources she was unable to cross-examine and that the admission of the documents thus violated her rights of confrontation under the Constitution and Fed.R.Crim.P. 32.1(b). Although we agree that some of Febus's

testimony with respect to the AI documents was hearsay, we see no basis for reversal, given, *inter alia*, the absence of any objection by Aspinall in the district court to one level of hearsay, the nature and reliability of the hearsay evidence to which Aspinall did object, and the inapplicability of the Confrontation Clause and the Federal Rules of Evidence to probation revocation proceedings. And although a defendant threatened with probation revocation has rights to certain procedural protections under the Due Process Clause and Rule 32.1, we find no violation of those rights here.

### 1. *The Hearsay Objection*

■ We begin by noting that part of Febus's testimony was indeed hearsay. Febus testified that (1) the FBI agent told her (2) what AI indicated as to (3) what instructions Aspinall had given AI. Thus, there are three levels of out-of-court statements at issue. The first and second, *i.e.,* what the FBI agent told Febus and what AI communicated to the FBI agent, were, as will be discussed below, hearsay. The third-level statements, however, *i.e.,* the instructions written on the AI documents, were not hearsay for two reasons. The classic definition of hearsay is testimony as to an out-of-court statement, offered to prove the truth of the matter asserted in that statement. *See, e.g., McCormick, Evidence* § 246, at 584 (2d ed. 1972) ("*McCormick on Evidence*"); Fed.R.Evid. 801(c) (" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). The AI documents were not offered for the truth of their contents but for the fact that the statements were made, *i.e.,* that the services of AI were engaged (Exhibit 3) and that AI was given instructions, as responses on its question-

naire form, on how to describe Aspinall's employment (*see* Exhibit 2); indeed, the government argued that the contents of the responses to the AI questionnaire were false (*see, e.g.,* Rev. Tr. 25). Accordingly, as they were not offered for their truth, the statements in the AI documents were not within the definition of hearsay. Further, if those statements were made by Aspinall, they would not be hearsay even if offered by the government for their truth, because a "party's own statement," offered against that party, is defined as "not hearsay." Fed.R.Evid. 801(d)(2)(A). *See also McCormick on Evidence* § 262, at 628–29 (even if regarded as hearsay, statements of a party opponent are admissible without presentation of any predicate or foundation).

■ On the other hand, the testimony of Febus as to statements made to her by the FBI agent was plainly hearsay. Part of that testimony described the agent's observations and matters within the agent's own knowledge: the layout of the premises at the address Aspinall had given for Shard, the observation that there was only a telephone answering service, not a consulting firm, operating there, and the fact that the agent was given two documents by AI. Although on this appeal Aspinall complains that the FBI agent was not produced at the hearing and hence could not be cross-examined, Aspinall made no objection to that part of Febus's testimony at the hearing. As revealed by the transcript passages set forth in Part I.A. above, defense counsel did not object until Febus, after giving the above testimony, was asked what the AI documents themselves showed with respect to Aspinall (*see* Rev. Tr. 23); and the objections focused solely on the source and import of the documents' contents (*see, e.g., id.* at 23, 24, 26, 27). Thus, Aspinall's present challenge to so much of Febus's testimony as de-scribed the FBI agent's actions and observations is reviewable only for plain error, *see* Fed.R.Crim.P. 52(b).

■ A plain error is one that prejudicially affected the defendant's "substantial rights" and "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (internal quotation marks omitted); *see, e.g., United States v. Gordon*, 291 F.3d 181, 193 (2d Cir.2002), *cert. denied*, 537 U.S. 1114, 123 S.Ct. 866, 154 L.Ed.2d 788 (2003). A plain-error challenge to the admission of evidence faces an uphill battle when the defendant has raised no question as to the information's relevance or accuracy. *Cf. United States v. Szakacs*, 212 F.3d 344, 353 (7th Cir.2000) (consideration of hearsay evidence at sentencing hearing held not plain error, in part because there was "no indication nor even an assertion at sentencing or on appeal that the hearsay was in any way inaccurate or misleading"), *cert. denied*, 532 U.S. 985, 121 S.Ct. 1631, 149 L.Ed.2d 492 (2001).

■ Aspinall's present challenge to the admission of Febus's description of the FBI agent's observations and receipt of documents from AI clearly fails the plain-error test. The lone presence of the AI answering service at the address Aspinall had given for Shard was relevant to the allegation that Aspinall had lied to the Probation Department about her employment. The FBI agent obviously would have been competent to testify to her observations of those premises; and, as the district court later noted, the layout of AI's premises was neither "hard to prove or disprove" nor "controversial" (Bail Hearing Transcript, August 12, 2004 ("Bail Tr."), at 5). Further, there can be little question that the AI documents were given to the agent by AI. Indeed, the substance

of the unobjected-to hearsay testimony by Febus has not been contested by Aspinall in any way. The admission of Febus's unchallenged testimony as to the FBI agent's observations and receipt of the documents from AI did not constitute plain error.

Aspinall did, however, challenge the testimony by Febus to the effect that AI had represented to the FBI agent that the instructions given in Exhibits 2 and 3 came from Aspinall. Febus did not attempt to recount the precise conversations between the agent and AI—which would have made the hearsay nature of the information received from AI clear—and the record does not include the details of those conversations. However, it was established that the agent had gone to AI's premises expressly to inquire about Aspinall and Shard; AI's giving the agent those two documents in response to the agent's questions constituted a representation by AI that it had received the statements on those documents from Aspinall, and as such, it was hearsay, for "actions" may be "as much a part of the speaker's effort at expression as his words are," *McCormick on Evidence* § 250, at 596; *see, e.g.,* Fed. R.Evid. 801(a)(2) ("nonverbal conduct of a person, if it is intended by the person as an assertion," is a "statement" within the meaning of the hearsay rule); *Stevenson v. Commonwealth,* 218 Va. 462, 237 S.E.2d 779 (1977) (where a police officer requested that the defendant's wife give him the clothes the defendant had been wearing on the day of a certain homicide, the wife's giving the officer a shirt constituted a nonverbal assertion that defendant wore that shirt on the day of that homicide). Thus, AI's giving the agent Exhibits 2 and 3 in response to the agent's inquiry is properly viewed as an assertion by AI that the source of the written statements on the documents was Aspinall.

At the hearing, Aspinall objected to that assertion as hearsay, stating, *inter alia,* that the admission of the documents would violate her "constitutional right of confrontation" (Rev. Tr. 24). On this appeal, she argues that the admission of Febus's testimony as to AI's representation that Aspinall made the statements in Exhibits 2 and 3 violated her rights of confrontation and cross-examination, as recently enunciated by the Supreme Court in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and as provided by the Federal Rules of Criminal Procedure.

### 2. The Sixth Amendment Right of Confrontation

In *Crawford v. Washington,* the Supreme Court held that in the trial of a criminal case, an out-of-court testimonial statement is prohibited by the Sixth Amendment's Confrontation Clause unless the witness is unavailable and the defendant has, or previously had, an opportunity to cross-examine him. *See* 541 U.S. at —— n. 9, 124 S.Ct. at 1365–66, 1369 n. 9. That Clause, however, gives an accused the right to be confronted with the witnesses against him "[i]n ... *criminal prosecutions,*" U.S. Const. amend. VI (emphasis added), and it has long been established that "[p]robation revocation, like parole revocation, is not a stage of a criminal prosecution," *Gagnon v. Scarpelli,* 411 U.S. 778, 782, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); *see Morrissey v. Brewer,* 408 U.S. 471, 480, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) ("revocation of parole is not part of a criminal prosecution"). Thus, in *Morrissey,* the Supreme Court noted that although a parolee is entitled not to have his parole revoked without due process, *id.* at 482, 92 S.Ct. 2593, "the full panoply of rights due a defendant in [a criminal prosecution] does not apply to parole revocations," *id.* at 480, 92 S.Ct. 2593; and in *Scarpelli,* the Court held that the same

principles apply to proceedings for the revocation of probation, *see* 411 U.S. at 782 & nn. 3, 4, 93 S.Ct. 1756. Nothing in *Crawford,* which reviewed a criminal trial, purported to alter the standards set by *Morrissey/Scarpelli* or otherwise suggested that the Confrontation Clause principle enunciated in *Crawford* is applicable to probation revocation proceedings.

### 3. *Criminal Procedure Rule 32.1(b)(2)(C) and Due Process*

The Federal Rules of Criminal Procedure provide that, in a probation or supervised-release revocation hearing, the defendant "is entitled to ... an opportunity to ... question any adverse witness unless the court determines that the interest of justice does not require the witness to appear." Fed.R.Crim.P. 32.1(b)(2)(C) (2002). Aspinall, relying on this Court's decision in *United States v. Chin,* 224 F.3d 121 (2d Cir.2000) (per curiam) (*"Chin"*), contends that this Rule required the district court to balance the reason for the government's failure to produce an AI witness against Aspinall's right of confrontation and that the court's admission of the AI documents without such a balancing analysis (and without even asking the government to explain that failure) constituted *"per se* error" (Aspinall brief on appeal at 30). We find no basis for reversal.

*Chin* dealt with a supervised-release revocation proceeding in which the defendant was charged with violating the terms of his supervised release by committing an assault with a firearm. *See* 224 F.3d at 122. *See also United States v. Jones,* 299 F.3d 103, 109 (2d Cir.2002) (the constitutional guarantees governing revocation of parole or probation are identical to those applicable to revocation of supervised release); *United States v. Sanchez,* 225 F.3d 172, 175 (2d Cir.2000) (same). At the *Chin* revocation hearing, the government did not produce the alleged victim of the assault; rather, government witnesses testified that the victim had asked about the defendant's release status, stating that she feared for her life, and they testified that numerous attempts had been made to locate the victim to have her testify at the hearing, but without success. *See* 224 F.3d at 123. At that time, the pertinent subpart of Rule 32.1 provided simply that the defendant in a revocation proceeding "shall be given ... the opportunity to question adverse witnesses," Fed. R.Crim.P. 32.1(a)(2)(D) (1993), without the qualification that appears in the current provision, to wit, "unless the court determines that the interest of justice does not require the witness to appear," Fed. R.Crim.P. 32.1(b)(2)(C) (2002). The *Chin* panel ruled, however, that the defendant's right of confrontation "[wa]s not absolute," 224 F.3d at 124, and that the district court was required to "balance the defendant's right of confrontation with the government's grounds for not allowing confrontation, ... and with the reliability of the evidence offered by the government," *id.* The court concluded that there had been no violation in the case before it because the district court had performed the balancing analysis.

Though the *Chin* opinion stated, without apparent limitation, that the court "must" conduct such a balancing analysis, *id.,* we subsequently held in *United States v. Jones,* 299 F.3d 103 (*"Jones"*), that that requirement is inapplicable where the out-of-court statement falls within an established exception to the hearsay rule, *see id.* at 114. In *Jones,* we noted that the out-of-court statement proffered by the government at the supervised-release revocation hearing was within the traditional hearsay exception for excited utterances, *see* Fed. R.Evid. 803(2), and we held that in that circumstance no balancing analysis and no explanation by the government for nonpro-

duction of the declarant were required. 299 F.3d at 113–14. We distinguished *Chin* as follows:

> The hearsay testimony offered in *Chin* did not appear to fall within any exception to the hearsay rule; neither was there any discussion in *Chin* of the applicability of hearsay exceptions. *See* [224 F.3d] at 123. This is significant because *it is well established that where the government seeks to introduce testimony under the excited utterance exception, and where that testimony is properly admitted by the district court, the government is under no constitutional obligation to explain the unavailability of the hearsay declarant* .... Consequently, *Chin's* requirement that the district court consider "the government's grounds for not allowing confrontation" does not apply to the instant case.

*Jones*, 299 F.3d at 113 (emphasis added). Thus, under *Jones*, the balancing analysis need not be made where the proffered out-of-court statement is admissible under an established exception to the hearsay rule. *Jones* also noted that a statement's " '[r]eliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception,' " *id.* at 114 (quoting *Idaho v. Wright,* 497 U.S. 805, 815, 110 S.Ct. 3139, 111 L.Ed.2d 638, (1990)), but that if further confirmation of reliability were needed at the *Jones* hearing, it was reflected in the district court's unimpeached view that the witness who testified to that statement had "no reason" to falsify the statement, *Jones,* 299 F.3d at 114.

■ The present case is more like *Jones* than like *Chin,* for the out-of-court statements at issue in *Chin* could not have been admitted under any traditional exception to the hearsay rule, whereas the documents at issue here are unquestionably AI business records. Nonetheless, the present case differs from *Jones* in that, here, the government did not proffer all of the foundation evidence necessary to have the AI documents admitted under the traditional exception for business records. Under that exception, a business record is "not excluded by the hearsay rule, even though the declarant is available as a witness," if it is a "record ... of acts[ or] events ... made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity." Fed.R.Evid. 803(6).

The Federal Rules of Evidence, however, other than those governing privileges, do not apply to proceedings "revoking probation." Fed.R.Evid. 1101(d)(3). And although Criminal Procedure Rule 32.1(b)(2)(C) reflects one of the due process components enunciated in *Morrissey,* i.e., "the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)," 408 U.S. at 489, 92 S.Ct. 2593, it is clear that Rule 32.1(b)(2)(C) also incorporates *Morrissey's* statement that in revocation proceedings the normal evidentiary constrictions should be relaxed:

> The hearing required by [the 1979 version of Rule 32.1(b)(2)(C), which was then numbered 32.1(a)(2) ] is not a formal trial; the usual rules of evidence need not be applied. *See Morrissey v. Brewer,* supra ("the process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial") ....

Fed.R.Crim.P. 32.1 Advisory Committee Note (1979). Similarly, in *Gagnon v. Scarpelli,* "with respect to the [probation revocation defendant's due process] rights to present witnesses and to confront and

cross-examine adverse witnesses," the Court noted that

> [w]hile in some cases there is simply no adequate alternative to live testimony, we emphasize that we did not in *Morrissey* intend to prohibit use where appropriate of the conventional substitutes for live testimony, including affidavits, depositions, and *documentary evidence.*

411 U.S. at 782 n. 5, 93 S.Ct. 1756 (emphasis added).

Although the government did not produce an AI employee to testify to the making or maintenance of Exhibits 2 and 3, the evidence in the present case was ample to permit the court to admit those documents under the more relaxed standard envisioned by *Morrissey* and *Scarpelli,* and hence by Rule 32.1(b)(2)(C) as well. First, there can be no question that those documents were AI business records: AI was in the answering-service business; Exhibit 2 was a 13–part "Customer Service Questionnaire" on AI letterhead, asking, *inter alia,* how the customer wanted AI to answer calls and inquiries from the customer's callers; and Exhibit 3 authorized payment to AI for its services. Nor can there be any question that the documents were maintained by AI: Febus testified without objection that the FBI agent was handed the documents by AI at AI's offices. Further, the record leaves little room for doubt that such records would normally be maintained by AI in the ordinary course of its business: AI had employees answering five telephones, presumably indicating its service of numerous customers; maintenance of records of each customer's instructions in response to the 13 questions would clearly be essential to AI's operations.

Finally, indicia of the reliability of AI's assertion that the customer information in Exhibits 2 and 3 had come from Aspinall were supplied by two types of evidence.

First, the documents were obtained not from some random location but rather from the very address that Aspinall had represented both to the Probation Department (*see* Government Exhibits 9 (Aspinall's monthly report) and 5 (the Shard Letter)) and to the Department of Justice (*see* Government Exhibit 1 (Aspinall's financial statement)) was the address of her employer, Shard.

Second, and more importantly, compelling evidence that the information in the AI documents had come from Aspinall was provided by the confluence of two unusual facets of this case, namely that that information was handwritten and that there were indisputable samples of Aspinall's handwriting in the record. If the instructions on Exhibit 2 had been typewritten, for example, it would probably have been necessary for the government to produce an AI witness to provide a foundation for imputing those instructions to Aspinall— *e.g.,* to testify that Aspinall herself had typed the instructions or that she had given the instructions to an AI employee who timely transcribed them or relayed them to another AI employee who did so. However, the instructions were in handwriting that matched the handwriting on Exhibits 1 and 9, which was undisputedly that of Aspinall (*see* Bail Tr. 18), furnishing compelling circumstantial evidence that the source of the instructions on the AI documents was indeed Aspinall.

Given these circumstances and the extended colloquy between defense counsel and the court at the revocation hearing with regard to whether Aspinall was the source of the instructions on the AI documents, and given the court's observation that no person other than Aspinall was shown to have any incentive for giving AI instructions on how to answer questions with respect to Aspinall's employment (*see* Rev. Tr. 26), we conclude that the district

court made the requisite determination that the interest of justice did not require the presence of an AI employee for admission of the AI documents. In light of this record, we cannot conclude that the admission of the AI documents violated Aspinall's rights under the Due Process Clause or Rule 32.1(b)(2)(C).

In any event, a district court's failure to comply with the interest-of-justice-determination requirement of Rule 32.1(b)(2)(C) and *Morrissey*/*Scarpelli* is subject to harmless-error analysis. *See, e.g., United States v. Redd*, 318 F.3d 778, 785 (8th Cir.2003) (court of appeals, itself engaging in a balancing analysis and making an interest-of-justice determination with respect to laboratory reports, concluded that the district court's failure to do so was harmless error); *United States v. Comito*, 177 F.3d 1166, 1169–70 (9th Cir. 1999) (conducting harmless-error analysis, but finding that district court's failure to conduct the balancing analysis was not harmless where the out-of-court oral statement was accusatory, did not fall within a recognized hearsay exception, and was of questionable reliability, and the nonhearsay evidence was insufficient). *See also* Fed.R.Crim.P. 32.1(b)(2)(C) Advisory Committee Note (2002) (citing, *inter alia, Comito* with respect to the need for a balancing analysis).

To the extent that the Rule or due process required a more explicit analysis or statement than is reflected by the record of the proceedings in the present case, we conclude that any error was, for two reasons, entirely harmless. First, the strong evidence, discussed above, of the reliability of the AI documents as reflecting statements made by Aspinall easily outweighed Aspinall's interest in cross-examining an AI employee, given, *inter alia,* that the AI documents are not accusatory, that AI had no apparent reason to fabricate instruc-

tions from Aspinall, and that no reason has been suggested why anyone else would have had an incentive to give AI instructions on how to answer questions with respect to Aspinall's employment. Second, any error was harmless in light of the overwhelming evidence supporting the court's findings of Aspinall's guilt even without consideration of the AI documents. Plainly those documents had no bearing on the charges that Aspinall disregarded her home confinement schedule and tampered with her monitoring device. And as to the charges that Aspinall had provided fraudulent information to the Probation Department with regard to her employment, the non-AI documents and the testimony of Febus showed, *inter alia,* that the (AI) address Aspinall repeatedly gave the government for Shard was at the very least misleading; that "Edna Reeves[,] Managing Partner" of Shard, who purportedly signed the Shard Letter stating that Aspinall would be working in Connecticut, was a fiction; that Aspinall falsely reported that she was on her way to Connecticut on an occasion when surveillance revealed that she was instead going home; that Aspinall sought to forestall an attempt by Febus to verify the Shard Letter's statements by falsely representing to Febus that Shard did not know Aspinall was on probation, when in fact Shard's only adult employee was Aspinall; and that Aspinall's professed fear that she would be fired if the fact that she was on probation were disclosed to Shard—*i.e.,* her own company—was clearly fraudulent.

In sum, the admission of the AI documents provides no basis for reversal.

## B. *The District Court's Ex Parte Conversation With Febus*

Aspinall also contends that the conversation between the district judge and Febus prior to the probation revocation

hearing affected the court's sentencing decision (*see, e.g.,* Aspinall brief on appeal at 32) and "so tainted the proceedings that it violated Ms. Aspinall's due process rights[,] requiring a new hearing" (*id.* at 35). The record does not support this contention.

At the start of the probation revocation hearing, the district judge informed the parties of information he had received from Febus earlier that morning. The court stated that

the probation officer visited me this morning. I think probation is technically an arm of the court. I don't know whether it constitutes an ex parte conversation in the usual sense or not. But I'll put on the record exactly what the conversation was.

Ms. Febus played for me a recording that is on a cell phone that was seized from Ms. Aspinall's apartment search. It was seized from the defendant as part of the search. And somehow there is recorded what sounds like a beating or a spanking of a child which goes on for a long time with what sounds like repeated slaps and a child crying for a long time. I don't know if the issue is going to come up today. I don't think it bears directly on the particular violations. But I thought that counsel ought to know about it. If defense counsel wants to listen to it at some point, it will be made available.

(Rev. Tr. 4; *see also id.* at 76 (again inviting counsel to listen to the cell phone voicemail recording if he wished).)

Aspinall's attorney responded that he "would accept the Court's statement that that will not affect any decision that you render on this" (*id.* at 4), but that he would have a problem if the conversation affected the court's consideration of the allegations against Aspinall because Aspinall was entitled to notice of all the charges against

her, and "[t]hat is not one of the charges" (*id.* at 5). Counsel stated, "I'm not asking your Honor to recuse yourself unless your Honor tells me that that might have an effect." (*Id.*) The court responded that

[i]t's not a charge. I don't think it is—I don't think it bears directly on any of the charges . . . .

The fact is this. I am confident that I can rule on particular charges based on the evidence that's presented . . . .

(*Id.*)

The testimony of Febus, the only government witness at the hearing, made no mention of the contents of the cell phone recording. In finding Aspinall guilty on four of the five charges asserted in the revocation petition, the court placed no reliance on the cell phone recording and stated that the contents of that recording "did not enter into [its] consideration in terms of guilt or nonguilt." (Rev. Tr. 75.) However, noting that the recording was "relevant now as to where we go from here," the court granted the government's request, to which Aspinall did not object, that Aspinall undergo a psychiatric evaluation. (*Id.* at 75–76.) The court also remanded Aspinall into custody pending sentencing and ordered that the psychiatric evaluation be expedited at the Metropolitan Correctional Center. The court stated that the reason for the remand was the court's "finding of guilt" with respect to Aspinall's duplicitous use of her former name after procuring a name change, her "effort to defraud the probation department," and "as a consequence, an effort to defraud the court as well." (*Id.* at 77–78.) When defense counsel brought up the cell phone recording, the court stated that it was "concerned" about what was on that recording, but "[t]hat's not why I'm remanding her. I am remanding her because of the seriousness of the violation." (*Id.* at 79.) The court reiterated,

I'm not minimizing the recording I heard on the cell phone. It is very troubling. *But my reason for remanding her is the seriousness of what's going on here. It's a complete and utter sham. It is submitting fraudulent documents to the probation department.*

(*Id.* at 79–80 (emphasis added).)

In sentencing Aspinall following her psychiatric evaluation, the court stated as follows:

I am extremely troubled by this case. I gave Ms. Aspinall a break. I sentenced her to probation the first time. Her conduct afterwards was extremely disturbing: Fabricating documents, submitting fabricated documents to the court, trying to commit a fraud on the probation department and the court.

I agree there are mental health issues, but they are not an excuse. I think it is a much more serious problem than merely difficulty adhering to the rules. Beyond that, I don't think to this day Ms. Aspinall accepts responsibility or acknowledges wrongdoing.

(S. Tr. 7.) At no point did the court mention the cell phone recording during the sentencing hearing or indicate that the information in that recording played any role in its sentencing decision. At no point during either the probation revocation hearing or the sentencing hearing did the defense ask the district judge to recuse himself.

Following the sentencing, Aspinall moved for bail pending appeal. In an effort to show some basis for an appeal, Aspinall argued, *inter alia,* that she had been prejudiced by the prehearing conversation between the court and Febus during which the court heard the cell phone recording. Denying the bail motion, the court stated that neither its findings of guilt nor its sentencing decision had been affected by the recording:

I don't know why Miss Febus chose to come see me that morning. I don't think she was trying to taint me. Maybe things came to a head and she was preparing for the hearing, I don't know. But *the fact is I was not tainted. I said it then, I'll say it again now, I said it a number of times: I was not tainted.* I was troubled. There is no question I was troubled. And that was one of the reasons why I thought there should be some follow-up, including some psychiatric follow-up.

. . . . You know, judges have to look at things all the time to decide whether they come in or not.

In a bench trial, for example, evidence is offered, I look at it, and then I might say objection sustained. It doesn't come in. Am I tainted? The answer is no, I am not tainted. *This did not bear either on my determination of guilt [ ]or on my sentencing.*

(Bail Tr. 17–18 (emphases added); *see also id.* at 22 ("With respect to the sentence, I will say it again: The voicemail did not impact on my sentence.").)

■ Given this record, we see no violation of Aspinall's due process rights by reason of the prehearing communication between Febus and the court. A probationer charged with violation of the conditions of her probation is, of course, "entitled to . . . disclosure of the evidence against" her in support of the charges. Fed.R.Crim.P. 32.1(b)(2)(B). She is also entitled to be sentenced only on the basis of information whose accuracy she has had an opportunity to challenge. *See, e.g., United States v. Louis,* 814 F.2d 852, 857–58 (2d Cir.1987) (vacating sentence affected by court's ex parte acquisition of expert information on sentencing standards applicable to persons convicted of drug trafficking in Hong Kong). We see no violation of

these principles here, where the information provided by Febus ex parte, which was disclosed at the outset of the probation revocation hearing, was neither a basis for nor related to the probation revocation charges.

As the district court properly stated (*see* Rev. Tr. 4), the Probation Department is an arm of the court. *See, e.g., United States v. Reyes,* 283 F.3d 446, 455 (2d Cir.2002), *cert. denied,* 537 U.S. 822, 123 S.Ct. 106, 154 L.Ed.2d 31 (2002). We have noted that the probation officer is a "confidential adviser to the court, . . . the court's 'eyes and ears,' a neutral information gatherer with loyalties to no one but the court." *Id.* (internal quotation marks omitted). As such, the probation officer is "often the most appropriate person[ ] to bring to the attention of the court . . . an offender's conduct that is threatening to the public." *Id.* at 457 (internal quotation marks omitted). *Accord United States v. Davis,* 151 F.3d 1304, 1306 (10th Cir.1998) ("Because of the close working relationship between the probation officer and the sentencing court, the probation officer may communicate ex parte with the district court." (internal quotation marks omitted)).

Here, Febus brought to the court's attention her concern that Aspinall might be abusing her nine-year-old daughter. This is precisely the sort of information that one would expect the "eyes and ears" of the court to bring to the court's attention. On the other hand, the probation officer in this case, rather than acting exclusively in that role, as advisor to the court, was seeking revocation of probation, and thus was acting as Aspinall's adversary. In addition, the officer waited until the very day of the revocation hearing to bring to the court's attention information she had had for some two months. Nevertheless, and crucially for purposes of this appeal, the district court promptly brought this information to Aspinall's attention at the start of the revocation hearing. And though the court found the information sufficiently troubling to warrant an order that Aspinall undergo a psychiatric examination, the court expressly stated that it would not consider that information in its assessment of the probation revocation petition.

In sum, the record is clear that the district court repeatedly assured Aspinall that the ex parte information it had received from Febus would not "taint" the court in deciding the merits of the revocation petition; and thereafter, the court repeatedly stated that the information had not had any effect on either its determination of Aspinall's guilt or its determination of an appropriate sentence. We see nothing in the record to contradict these assurances, and we conclude that the court's receipt of that information caused no violation of Aspinall's right to due process.

## C. *The Sentencing Challenge*

■ Finally, Aspinall's contention that the nine-month term of imprisonment imposed by the district court was unreasonably long similarly lacks merit. In imposing sentences for probation violations, for which Chapter 7 of the Guidelines Manual provides only nonbinding policy statements rather than guidelines, the district court has broad discretion, and this Court will overturn a sentence imposed upon revocation of probation only if the sentence is "plainly unreasonable," 18 U.S.C. § 3742(e)(4); *see United States v. Sweeney,* 90 F.3d 55, 57 (2d Cir.1996). While not bound by sentencing guidelines, the court is required to consider the Chapter 7 policy statements, *see, e.g., United States v. Anderson,* 15 F.3d 278, 283–84 (2d Cir. 1994), and "we will affirm the district court's sentence provided (1) the district court considered the applicable policy

statements; (2) the sentence is within the statutory maximum; and (3) the sentence is reasonable," *id.* at 284. "[W]e have generally accorded sentencing judges a presumption of awareness of sentencing options .... " *United States v. Sweeney,* 90 F.3d at 58.

In the present case, the sentence imposed, nine months' imprisonment, obviously was a small fraction of the 10–year statutory maximum applicable to Aspinall's underlying credit-card-fraud offense; and we see no basis for concluding either that the district court did not consider the Chapter 7 policy statements or that the sentence imposed was unreasonable. The most relevant policy statement reads, in pertinent part, that "at revocation the court should sanction primarily the defendant's breach of trust, while taking into account, to a limited degree, the seriousness of the underlying violation and the criminal history of the violator," Guidelines Ch. 7, Pt. A(3)(b). We think it plain that the district court was aware of this policy statement and had these considerations in mind at all stages of the proceeding.

At the outset, the Probation Revocation Petition made detailed reference to Guidelines Chapter 7, pointing out to the court that the range of imprisonment suggested by § 7B1.4(a) in this instance was three-to-nine months, that this was part of a policy statement rather than a binding guideline, and that if found guilty of a probation violation Aspinall could be sentenced to up to 10 years' imprisonment. At the revocation hearing, after finding Aspinall guilty of charges 1–4, the court noted that her probation violations, especially those found with respect to charges 1 and 2, were not merely "technical" violations but were "serious," reflecting a "scheme" to defraud the Probation Department and the court and an abuse of the trust the court had reposed in her. (Rev. Tr. 78.) For example, the court noted that Aspinall's fraudulent conduct "comes immediately after a sentence of probation. I didn't send her to jail. I gave her the benefit of the doubt. I gave her another chance. And then all of this stuff happens." (*Id.* at 80.) The court also referred to the facts that Aspinall was first charged with credit card fraud in June 2002 under the name Kareese Lindsay, and that in March 2003, after being informed that she had officially changed her name in hopes of escaping domestic violence, the court had entered an order allowing the federal case caption to be changed to reflect her new name, Clarissa Aspinall. Judge Chin stated, "Frankly, I am extremely concerned by the fact that I was induced into permitting this name change based on representations that Ms. Aspinall was at risk. And I suspect now that it was all part of some scheme." (Rev. Tr. 78.)

At the sentencing hearing, Aspinall's attorney referred the court to the three-to-nine-month range set out in the Chapter 7 policy statement. He pointed out that Aspinall had spent 70 days in custody since the revocation hearing, argued that that period was "pretty close" to "the low end of 3 to 9 months," and urged the court not to sentence Aspinall to more than those 70 days' imprisonment. (*See* S. Tr. 4.) In sentencing Aspinall to imprisonment for nine months, the top of that range, the court cited, *inter alia,* the facts that it had previously sentenced her leniently and that she had flagrantly abused her probationary status. (*See id.* at 7 ("I gave Ms. Aspinall a break. I sentenced her to probation the first time. Her conduct afterwards was extremely disturbing: Fabricating documents, submitting fabricated documents to the court, trying to commit a fraud on the probation department and the court.").)

This record belies Aspinall's contention that the court did not consider the Guidelines policy statement that a sentence of up to nine months' imprisonment could be appropriate for a defendant who breached the trust confided by the court in imposing probation. Further, at Aspinall's bail hearing, the district judge confirmed that he had considered the Guidelines policy statements, stating that he had "stopped it at nine [months] rather than something higher because [he] wanted to be within the guidelines." (Bail Tr. 11.)

Given the circumstances of this case and the district court's comments, we cannot conclude that the sentence imposed on Aspinall was unreasonable, much less, in the language of § 3742(e)(4), "plainly" so.

## CONCLUSION

We have considered all of Aspinall's arguments on this appeal and have found them to be without merit. The judgment of the district court is affirmed.