**UNITED STATES of America,**
**Appellee,**

v.

**Larry F. JONES, Defendant–Appellant.**

**Docket No. 01–1607.**

United States Court of Appeals,
Second Circuit.

Argued: June 25, 2002.

Decided: Aug. 2, 2002.

Martin R. Stolar, New York, NY, for Defendant–Appellant.

Sharon L. McCarthy, Assistant United States Attorney (James B. Comey, United States Attorney for the Southern District of New York and Deborah E. Landis, Assistant United States Attorney, on the brief), New York, NY, for Appellee.

Before JACOBS, LEVAL, and KATZMANN, Circuit Judges.

KATZMANN, Circuit Judge.

Defendant Larry Jones appeals from the judgment of the United States District Court for the Southern District of New York (Michael B. Mukasey, *Chief Judge*), revoking his supervised release and sentencing him to a term of imprisonment. Jones argues that he was deprived of his Fifth Amendment right against compelled self-incrimination by the district court's decision to proceed with a revocation hearing prior to adjudication in state court of the charges that served as the basis for the revocation request. Jones further contends that his Sixth Amendment right to confront adverse witnesses was violated by the district court's reliance on hearsay testimony. For the reasons that follow, we affirm.

## BACKGROUND

On June 22, 1995, Jones pleaded guilty to charges that he participated in a racketeering enterprise through predicate acts of murder (as an accessory after the fact) and conspiracy to distribute crack cocaine. At sentencing, the district court granted the government's substantial assistance motion, *see U.S. Sentencing Guidelines Manual*, § 5K1.1, and departed downwards from the presumptive sentence under the Guidelines of 360 months to life imprisonment. Jones received a sentence of time served, with a five-year term of supervised release.

On May 24, 2001, the U.S. Probation Department submitted a Request for Court Action/Direction ("Request for Action"), which it subsequently amended on June 25, 2001, alleging that Jones had violated the terms of his supervised release. The Request for Action explained that Jones had been arrested twice by the

New York City Police Department in recent weeks. The first arrest, which occurred on May 17, 2001, was on charges of menacing, criminal trespass, resisting arrest, public lewdness, and exposure, arising from an incident in which Jones was alleged to have exposed himself to a minor. The second arrest, which occurred on June 12, 2001, stemmed from a threatening phone call that Jones allegedly made to his former girlfriend. The Request for Action also stated that Jones had failed to notify his probation officer within seventy-two hours of the May 17th arrest, as required under the conditions of his supervised release.

Judge Mukasey held a preliminary hearing on the Request for Action on July 13, 2001. At the time of the hearing, Jones had been freed on bail by the Supreme Court of New York, pending resolution of the state charges against him. The government moved the district court to remand Jones to federal custody while awaiting the final revocation hearing. Jones's counsel opposed this motion and requested that the revocation hearing be delayed until after disposition of the state charges. Judge Mukasey denied the government's motion for remand, but moved ahead with the revocation proceedings and scheduled an evidentiary hearing for September 5, 2001.

At the hearing, Jones's counsel repeated his request to postpone the proceedings until the state charges were adjudicated, arguing that an evidentiary hearing would "seriously imping[e]" Jones's Fifth Amendment rights in the pending state cases. (Transcript of Evidentiary Hearing, Sept. 5, 2001 ("Tr."), 2–3). Defense counsel also noted the government's intent to rely on hearsay testimony concerning the alleged exposure incident, rather than on direct testimony from eyewitnesses. Defense counsel contended that the use of hearsay would "almost obligat[e]" Jones to testify in his own defense at the revocation hearing in order to show the unreliability of that evidence. (Tr. 3). Relying on *United States v. Sackinger*, 537 F.Supp. 1245, 1250 (W.D.N.Y.1982), *aff'd* 704 F.2d 29 (2d Cir.1983), defense counsel argued that it would be a "better practice" to await resolution of the state charges before proceeding with a revocation hearing concerning those same charges. (Tr. 4). The district court rejected this view, explaining that while Jones faced a "very difficult tactical situation," the fact that he was forced to choose between asserting his Fifth Amendment right against forced self-incrimination and testifying at the revocation hearing did not mean that Jones was deprived of that Fifth Amendment right. (Tr. 6).

As for the hearsay testimony itself, defense counsel objected that the admission of such testimony would violate Jones's Sixth Amendment right to confront adverse witnesses because the testimony lacked sufficient indicia of reliability and the government had no legitimate reason for declining to call the eyewitnesses. In response, the government explained that its decision not to call the firsthand witnesses was justified by both Jones's history of violent behavior, exposing the witnesses to the risk of retribution, and the sexual nature of the testimony that would be elicited from a 15–year–old girl. The district court stated that it could "understand not putting a 15–year–old girl on the witness stand to testify to allegations of the sort involved here" (Tr. 5), and further acknowledged Jones's history of violent conduct. (Tr. 11). The district court decided to rule on the admissibility issues after hearing the testimony.

The government called two New York City police officers, Calvin Moreland and Kevin Owens, to testify regarding defendant's arrest on the exposure-related

charges.[1] Officer Moreland testified that he was off duty in the late afternoon of May 17, 2001, working in the garage at the back of his residence on 1731 Popham Avenue in the Bronx, New York. Around 5 o'clock p.m., Moreland heard his wife calling from the front of the house, "honey, honey, come to the front, quick, quick, quick." (Tr. 13). He ran around to the front and saw his daughter's fifteen-year-old friend, Karin, outside the gate to his house. Moreland stated that his wife, who was standing at a front window, told him that there was a man in the lobby of the six-story apartment building directly across from the house who had been masturbating and giving Karin "catcalls." (Tr. 13). She told Moreland that the man had run back into the building from the lobby, and described the man's clothing. Moreland also spoke to Karin. He testified that Karin told him that there had been "a guy across the street," in the doorway to the lobby, with "his pants down around his ankles," who was "masturbating" and calling to her "psst, psst, psst." (Tr. 14–15). When asked on cross-examination whether Karin had indicated that she feared "serious physical injury or death," Moreland stated that "[a]ll she told me is she was scared." (Tr. 31).

Immediately after speaking with his wife and Karin, Moreland went across the street and entered the lobby of the apartment building. He testified that he encountered the defendant coming down the stairs. According to Moreland, Jones was wearing clothing that matched the description he had received from his wife and Karin—a blue jacket and dark-colored pants. Moreland asked Jones what he was

doing "in front of my home, in front of my family." (Tr. 16). Moreland testified that Jones responded that he did not know what Moreland was talking about, and that he "had people that live in this building." (Id.). Jones then turned around and went back upstairs. Rather than pursuing him, Moreland ran to his house to get his police shield, and told his wife to call 911. When Moreland returned to the apartment building, he again encountered the defendant coming down the stairs. Moreland testified that Jones "motioned to [him] like he was reaching for a weapon or something." (Tr. 17). Moreland explained, however, that he only saw a "black object" in Jones's hands (Id.), and conceded on cross-examination that he could not tell whether the object was actually a firearm or other type of weapon. (Tr. 25). When Moreland displayed his police shield, Jones ran back up the stairs, at which point Moreland left the building as uniformed officers responded to the scene. He remained outside until he was told that the officers had a suspect in custody. Moreland went inside the building to identify Jones, after which Jones was placed under arrest. According to Moreland, as Jones was being led from the building to a police car, he asked why Moreland was "doing this," and then said to Moreland, "[i]t's not over. Okay. I'll get you." (Tr. 18).

The government next called Officer Owens. He was one of the police officers who responded to the 911 call placed by Moreland's wife, searched the apartment building, and apprehended Jones. He testified that when he arrived at the scene, he was informed by Moreland that a man had

---

1. The government also called witnesses to testify about Jones's arrest for alleged harassment and threatening of his former girlfriend. The district court, however, found that this allegation had not been proven. This testimony is therefore irrelevant to the instant appeal. Additionally, the government chose not to pursue the allegation that Jones failed to timely report his May 17th arrest to the Probation Department, noting that Jones had, in fact, called his Probation Officer immediately upon his release from police custody.

exposed himself to one of Moreland's relatives and that the man had a gun. Owens entered the building and eventually encountered Jones leaning against a wall on the fourth floor, immediately to the right of the elevator. Owens recalled that Jones was wearing a white t-shirt, but did not have a jacket. Owens and his partner placed Jones in handcuffs and asked Jones what he was doing in the building. Owens testified that Jones explained that he was "looking for a friend" who lived in Apartment 4F. (Tr. 40). When the officers knocked on the door of that apartment, however, there was no response. A search of the fourth floor landing was then conducted, and Owens recovered a jacket in the elevator, near the top of the elevator door. Owens's partner placed Jones under arrest.

On cross-examination, Owens acknowledged that no weapon had been recovered from the apartment building, even though Jones was booked for weapons possession. Cross-examination also revealed certain inconsistencies between Moreland's account of the incident and Owens's testimony as to what Moreland had told him and the other officers who arrived on the scene. Specifically, Owens recalled that Moreland had informed the arriving officers that one of his relatives was *in* the apartment building and that Moreland himself had seen Jones exposed.

After calling another law enforcement witness (but not questioning him), the government requested an adjournment of the hearing to secure the testimony of Moreland's wife. The government explained that it was concerned about defendant's hearsay objection to Moreland's testimony. The district court, however, indicated its belief that there was no need to call Moreland's wife to testify because Moreland's account of the exposure incident was covered by either the present sense impres-

sion or excited utterance exceptions to the hearsay rule. *See* Rule 803(1) and (2), Fed.R.Evid. In response, defense counsel disagreed that the statements made to Moreland fell under the exception for present sense impressions, but conceded the possible applicability of the excited utterance exception. Counsel further asserted that eyewitness testimony was necessary because Moreland's account "stretche[d] the imagination." (Tr. 79). Judge Mukasey disagreed. The government then rested.

Following the close of the government's case, Jones testified in his own defense. He stated that on May 17, 2001, he "*went up to* the Bronx" in order to "see a friend about some business" involving the sale of videotapes. (Tr. 87) (emphasis added). Later, however, Jones testified that he lived at his "sister's house" *in* the Bronx, only "a block and a half away" from where he was arrested. (Tr. 88, 93). Jones stated that his friend lived in Apartment 4F of the building across from Moreland's home. Jones gave the following account of his arrest: After knocking on his friend's door but getting no response, Jones walked down the stairs to the lobby of the building, where he was approached by a man who claimed Jones had been "doing stuff in front of him and his family." (Tr. 88). Jones stated that he told the man that he had no idea what the man was talking about and that he lived in a nearby apartment building. Jones denied having exposed himself and denied wearing a jacket that day, although he stated that he was wearing a white t-shirt and blue pants.

On cross-examination, Jones acknowledged that on more than one prior occasion he had been ticketed by the police for exposing himself, although Jones testified that he had been merely urinating. Jones also explained that after the initial confrontation in the lobby, he returned to his

friend's door because he believed that "there [was] going to be a problem now." (Tr. 94). Jones denied that Officer Moreland had displayed his police shield at any time. Finally, Jones admitted to having told Moreland "I won't forget you," but denied that this was a threat. (Tr. 96).

At the close of the evidence, defense counsel renewed his objections to Officer Moreland's testimony. Counsel argued that the government's case relied primarily on "somewhat unreliable hearsay" (Tr. 98), and suggested that the government could have called Moreland's wife and Karin to testify as eyewitnesses to the alleged exposure incident. The district court once again rejected these arguments, finding Moreland's hearsay testimony to be admissible under the present sense impression and excited utterance exceptions. Judge Mukasey specifically credited Moreland's testimony that "his wife summoned him in a highly upset and excited state." (Tr. 99). Consequently, the district court found that the hearsay testimony could be relied on "regardless of the availability of the declarants." (Tr. 100). Although acknowledging that certain inconsistencies in the officers' testimony had been developed on cross-examination, the district court found that these inconsistencies were immaterial. The district court further determined that defendant's testimony was "incredible on its face," observing that Jones's account "would have Officer Moreland simply falsifying the story for no reason." (Tr. 101).

On November 19, 2001, the district court issued an order revoking defendant's five-year term of supervised release and sentencing him to six months' imprisonment, to be followed by a new supervised release term of four years and six months.

## DISCUSSION

Before turning to Jones's specific claims, we pause to note that the constitu-tional guarantees governing revocation of supervised release are identical to those applicable to revocation of parole or probation. *See United States v. Sanchez*, 225 F.3d 172, 175 (2d Cir.2000). These protections "tak[e] the form of a collection of due process rights," among which is "the right to confront and cross-examine adverse witnesses (unless the hearing officer finds good cause for not allowing confrontation)." *Id.* "The Supreme Court does not, however, attach to revocation proceedings the full range of procedural safeguards associated with a criminal trial because a probationer already stands convicted of a crime." *Id.* (internal citations omitted).

## I. Fifth Amendment Claim

On appeal, Jones first argues that he was denied the Fifth Amendment's protection against compelled self-incrimination by having to testify at his revocation hearing before the adjudication of the state charges against him. Jones seeks a bright line rule that federal courts should delay revocation proceedings until after the disposition of state charges that form the basis of revocation requests.

Jones relies heavily on *United States v. Sackinger*, 537 F.Supp. 1245, 1250 (W.D.N.Y.1982), in which the district court explained that "[o]rdinarily, the government's forbearance in commencing probation violation proceedings serves various salutary purposes," including "avoiding the need to have the probationer testify in the probation violation proceeding as to matters which may prejudice him in the criminal case." *Id.* In *Sackinger*, however, the district court was considering a claim that the government's *delay* in initiating violation of probation proceedings until after the resolution of the underlying state charges amounted to deprivation of the defendant's right to a speedy hearing. *See id.* at 1247. The district court's discussion

of the timing of revocation proceedings was therefore aimed specifically at *justifying* the government's "forbearance," rather than *mandating* it. Nowhere in *Sackinger* does the district court suggest that such postponement is a constitutional requirement.

The Supreme Court has identified the key inquiry in determining whether a violation of the right against compelled self-incrimination has occurred as "whether the accused was deprived of his free choice to admit, to deny, or to refuse to answer." *Garrity v. New Jersey*, 385 U.S. 493, 496, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967) (internal quotation omitted). In *Garrity*, serious penalties were attached to the exercise of the Fifth Amendment right: The witnesses, who were police officers being investigated for misconduct, were informed that they could remain silent, but that if they did so, they "would be subject to removal from office." *Id.* at 494, 87 S.Ct. 616. The Court set aside the officers' convictions, noting that unconstitutional coercion was present where the "choice imposed on petitioners was one between self-incrimination or job forfeiture." *Id.* at 496, 87 S.Ct. 616. The Court found that the choice "to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent." *Id.* at 497, 87 S.Ct. 616; *see also Lefkowitz v. Cunningham*, 431 U.S. 801, 806, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977) (explaining that "the government cannot penalize assertion of the constitutional privilege against compelled self-incrimination by imposing sanctions to compel testimony which has not been immunized."). By contrast, the choice faced by defendant in this case was nothing like that found in *Garrity*. There was no penalty imposed on defendant *in order to* force his testimony, nor any threat of punishment intended to interfere with the exercise of his Fifth Amendment

right. *See Lefkowitz*, 431 U.S. at 805, 97 S.Ct. 2132 (holding that "a State may not impose substantial penalties *because* a witness elects to exercise his Fifth Amendment right not to give incriminating testimony against himself") (emphasis added); *see also Minnesota v. Murphy*, 465 U.S. 420, 434, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984) (suggesting that Supreme Court views with particular suspicion cases in which "the state not only compelled an individual to appear and testify, but also sought to induce him to forgo the Fifth Amendment privilege by threatening to impose economic or other sanctions capable of forcing the self-incrimination which the Amendment forbids") (internal quotation omitted); *United States v. Washington*, 431 U.S. 181, 188, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977) (stating that "[t]he constitutional guarantee is only that the witness be not *compelled* to give self-incriminating testimony").

Jones was not *compelled* to testify. He could have pursued any number of legal strategies at his revocation hearing. While offering his own testimony was certainly one option, he could have chosen to attack the government's case by offering the testimony of other individuals, including hearsay testimony of the kind presented by the government, as well as other kinds of evidence. *See Morrissey v. Brewer*, 408 U.S. 471, 489, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (explaining that revocation proceedings are "flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial"). *See also* Rule 32.1(a)(2)(D), Fed. R.Crim.P., Advisory Committee Notes (1979 Addition) ("The hearing required by rule 32.1(a)(2) is not a formal trial; the usual rules of evidence need not be applied."). As another option, Jones could have chosen not to present any evidence

at all, putting the government to its proof and relying on cross-examination to undermine the reliability of the government's witnesses. Indeed, it appears that Jones's counsel had some success in drawing out inconsistencies between the hearsay testimony of Office Moreland and what he told other officers at the scene, even though these inconsistencies were ruled immaterial.

■ Jones nevertheless decided to testify himself, presumably having determined that such testimony was the most effective means to discredit the government's case. To be sure, this determination carried with it the risk that his testimony would prejudice his state court defense. But it remained defendant's choice to testify or remain silent. The Fifth Amendment does not immunize a defendant from all the potentially negative consequences of making such a choice. As the Supreme Court has noted, "[t]he criminal process, like the rest of the legal system, is replete with situations requiring 'the making of difficult judgments' as to which course to follow." *McGautha v. California*, 402 U.S. 183, 213, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971) (quoting *McMann v. Richardson*, 397 U.S. 759, 769, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)). "Although a defendant may have a right, even of constitutional dimensions, to follow which course he chooses, the Constitution does not by that token always forbid requiring him to choose." *Id.* at 213, 91 S.Ct. 1454. *Cf. McKune v. Lile,* —— U.S. ——, 122 S.Ct. 2017, 2026, 153 L.Ed.2d 47 (2002) (finding no unconstitutional compulsion to speak about past crimes where prisoner faced loss of privileges and transfer to possibly more dangerous, higher-security unit for refusing to do so) (plurali-

ty opinion); *see also id.* at 2033 ("Not all pressure necessarily 'compels' incriminating statements.") (O'Connor, *J.,* concurring). Any "coercive" effect of the choice that Jones faced was particularly attenuated given that the negative consequences that could possibly flow from his decision to remain silent could only be imposed after the adversarial workings of the revocation hearing, presided over by an independent fact-finder. *See id.* at 2035 ("I believe the proper theory should recognize that it is generally acceptable to impose the risk of punishment, however great, so long as the actual imposition of such punishment is accomplished through a fair criminal process.") (O'Connor, *J.,* concurring).[2] Finally, Jones's argument suffers from an additional problem. If it were constitutionally mandated that the revocation hearing be stayed pending state proceedings, it would seem that something like the same dilemma would arise if the state proceedings were not stayed pending the revocation hearing.

In sum, the fact that Jones was required to choose between asserting his right to silence and pursuing what he believed to be the most effective defense against revocation does not mean that Jones faced the kind and intensity of coercion that could deprive him of the right against compelled self-incrimination. Accordingly, we find no Fifth Amendment violation; nor do we conclude that imposing a "bright line" rule as to the timing of revocation hearings *vis-à-vis* state court proceedings is either necessary or desirable. The issue is one for the exercise of the district court's discretion.

---

**2.** As Justice O'Connor noted in her concurrence, the Supreme Court in *Lile* was unable to reach a conclusive decision "on the question of what standard to apply when evaluating compulsion for the purposes of the Fifth Amendment privilege against self-incrimination in a prison setting." *Lile,* 122 S.Ct. at 2032 (O'Connor, *J.,* concurring). We need not take any position on this specific question here, and we do not.

## II. Sixth Amendment Claim

Jones next argues that the district court erred in not demanding that Karin and Officer Moreland's wife testify at the revocation hearing, rather than receiving hearsay evidence from Officer Moreland as a substitute. Jones suggests that the district court's determination as to the admissibility of the hearsay evidence was in error, and further argues that the district court's reliance on this evidence violated his Sixth Amendment right to confront witnesses against him. Because we find no error in the district court's admissibility determination, we reject Jones's Sixth Amendment claim.

■■■ We review admissibility determinations for abuse of discretion. *See United States v. Tocco*, 135 F.3d 116, 127 (2d Cir.1998). As we have explained, "[a] district court 'abuses' or 'exceeds' the discretion accorded to it when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision ... cannot be located within the range of permissible decisions." *Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 169 (2d Cir.2001); *see also United States v. SKW Metals & Alloys, Inc.*, 195 F.3d 83, 87 (2d Cir.1999) ("Evidentiary rulings are reversed only if they are 'manifestly erroneous,' such that the admission constitutes an abuse of discretion."). Here, the district court concluded that the hearsay testimony of Officer Moreland concerning the statements of his wife and Karin were admissible under the present sense impression and excited utterance exceptions to the hearsay rule. As defined by the Federal Rules of Evidence, a present sense impression is a statement "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." Rule 803(1), Fed.R.Evid. Such statements are considered to be trustworthy because the contemporaneity of the event and its description limits the possibility for intentional deception or failure of memory. *See United States v. Brewer*, 36 F.3d 266, 272 (2d Cir.1994).

■■■ The hearsay exception for excited utterances is premised on a similar, though distinct, assumption that the reliability of a statement increases as opportunity for reflection by the declarant decreases. An "excited utterance" is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Rule 803(2), Fed.R.Evid. As we have explained, "[t]he rationale for this hearsay exception is that the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability." *Tocco*, 135 F.3d at 127. Unlike present sense impressions, "[a]n excited utterance need not be contemporaneous with the startling event to be admissible." *Id.* Rather "[t]he length of time between the event and the utterance is only one factor to be taken into account in determining whether the declarant was, within the meaning of rule 803(2), 'under the stress of excitement caused by the event or condition.' " *United States v. Scarpa*, 913 F.2d 993, 1017 (2d Cir.1990).[3]

---

**3.** Thus while the hearsay exception for present sense impressions focuses on *contemporaneity* as the guarantor of reliability, and requires that the hearsay statement "describe or explain" the contemporaneous event or condition, Rule 803(1), Fed.R.Evid., the excited utterance exception is based on the *psychological impact* of the event itself, and permits admission of a broader range of hearsay statements—*i.e.* those that "relate to" the event. Rule 803(2), Fed.R.Evid.

For several reasons, we cannot conclude that the district court abused its discretion in admitting Officer Moreland's hearsay testimony under either of these exceptions. *First,* the events reported to Officer Moreland (*i.e.* a man exposing himself, masturbating, and making catcalls to a teen-age girl) were certainly startling enough to support application of the excited utterance exception. *Second,* the statements made by the declarants to Officer Moreland were nearly contemporaneous with the event described. *Third,* Karin reported being "scared" by what she had witnessed, and Moreland's wife appeared, from his testimony, to be agitated, calling to him to "come to the front, quick, quick, quick." These circumstances clearly justify invocation of either the present sense impression or excited utterance exceptions to the hearsay rule.

Jones nevertheless urges us to overturn the district court's determination, citing *United States v. Chin,* 224 F.3d 121 (2d Cir.2000), in which we held that a district court presiding over a revocation hearing "must balance the defendant's right of confrontation with the government's grounds for not allowing confrontation . . . and with the reliability of the evidence offered by the government." *Id.* at 124 (internal citations omitted). Jones's reliance on *Chin* is misplaced.

 The hearsay testimony offered in *Chin* did not appear to fall within any exception to the hearsay rule; neither was there any discussion in *Chin* of the applicability of hearsay exceptions. *See id.* at 123. This is significant because it is well established that where the government seeks to introduce testimony under the excited utterance exception, and where that testimony is properly admitted by the district court, the government is under no constitutional obligation to explain the unavailability of the hearsay declarant. *See*

*White v. Illinois,* 502 U.S. 346, 353–358, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992) (ruling that Confrontation Clause does not require showing of witness unavailability where hearsay statements of witness were admissible under "spontaneous declaration" exception); *Tocco,* 135 F.3d at 128 (applying *White* to uphold admission of "excited utterance" without showing of unavailability); *see also United States v. Inadi,* 475 U.S. 387, 394–98, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986) (holding that showing of witness unavailability was not required under Confrontation Clause for admission of out-of-court statements made by co-conspirators); *Reardon v. Manson,* 806 F.2d 39, 41 (2d Cir.1986) ("The unavailability rule . . . was developed in a series of cases in which the prosecution offered written records of prior testimony in place of live testimony at trial, and the rule should not be extended mechanically to other factual contexts."). Consequently, *Chin's* requirement that the district court consider "the government's grounds for not allowing confrontation" does not apply to the instant case. But, even if we *were* to consider this prong of the *Chin* test, we accept the validity of the government's stated reasons for not calling the hearsay declarants. *First,* with regard to the teenage girl Karin, her age and the sexual nature of the testimony she would be required to give furnish ample justification for the government's decision not to call her. *Second,* with regard to both eyewitnesses, Jones's history of violent conduct made reprisal against them a possibility. There was no error in the district court's acceptance of those reasons.

 As for the reliability of Officer Moreland's hearsay testimony, the fact that this testimony is covered by "firmly rooted" exceptions to the hearsay rule provides the necessary guarantee of its trustworthiness. *See, e.g., Idaho v. Wright,* 497

U.S. 805, 815, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990) ("Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception."); *see also White*, 502 U.S. at 355 n. 8, 112 S.Ct. 736 (explaining that there can be "no doubt" that hearsay exception for "spontaneous declarations" is "firmly rooted"). Moreover, Judge Mukasey indicated that he found Moreland's hearsay testimony reliable for another reason, namely, its compatibility with the direct testimony taken from Moreland and Officer Owens— particularly concerning the details of defendant's clothing. The district court also concluded that defendant's testimony was "incredible on its face," noting that defendant's version of events "would have Officer Moreland simply falsifying the story for no reason." We find nothing in this reasoning that would justify overturning the district court's determination that Officer Moreland's testimony was reliable.

Thus *Chin* does not support defendant's Sixth Amendment claim, and his appeal on this ground must fail.

### CONCLUSION

Having considered all of Jones's arguments on appeal and finding no basis for reversal, the judgment of the district court is accordingly affirmed.