17-2348-cr
USA v. Ojudun

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2018

(Submitted:  October 24, 2018                    Decided:  February 8, 2019)

Docket No. 17-2348-cr

_____

UNITED STATES OF AMERICA,

*Appellee,*

- v. -

OLUWOLE OJUDUN,

*Defendant-Appellant.*[*]

_____

Before:  KATZMANN, *Chief Judge*, KEARSE, *Circuit Judge*, MEYER, *District Judge*[**].

---

[*]     The Clerk of Court is directed to amend the official caption to conform with the above.

[**]    Judge Jeffrey A. Meyer, of the United States District Court for the District of Connecticut, sitting by designation.

Appeal from a judgment of the United States District Court for the Southern District of New York, Katherine B. Forrest, then-*Judge*, revoking defendant Ojudun's supervised release--imposed following his prior federal conviction for conspiracy to commit bank fraud--on the grounds that while on such release he, *inter alia*, committed two financial crimes in violation of New Jersey law and associated with a known felon and thereby violated the conditions of release, and ordering him to serve 30 months' imprisonment, to be followed by two years of supervised release. On appeal, Ojudun contends principally that the court erred (1) in denying his motion to suppress, on Fourth Amendment grounds, evidence resulting from New Jersey police officers' stop of the vehicle in which he was a passenger, and (2) in admitting, over his hearsay objection, evidence of postarrest statements made by the vehicle's driver as statements against the interest of the driver. We find no merit in Ojudun's Fourth Amendment challenges to the stop and search of the vehicle. However, we conclude that evidence of statements by the driver that incriminated Ojudun without incriminating the driver did not fall within the hearsay exception provided by Rule 804(b)(3) of the Federal Rules of Evidence for statements against the interest of the declarant, and that the court did not perform the analyses required under Rule 804(b)(3)(B) or under Rule 32.1(b)(2)(C) of the Federal Rules of Criminal Procedure,

2

in order to determine the admissibility of the declarant's other statements. We thus vacate the judgment and remand for further proceedings.

Vacated and remanded.

GEOFFREY S. BERMAN, United States Attorney for the Southern District of New York, New York, New York (Daniel S. Noble, Anna M. Skotko, Assistant United States Attorneys, New York, New York, of counsel), *for Appellee*.

BENNO & ASSOCIATES, New York, New York (Ameer Benno, New York, New York, of counsel; Adam D. Perlmutter, Perlmutter & McGuinness, New York, New York, of counsel on the initial brief), *for Defendant-Appellant*.

KEARSE, *Circuit Judge*:

Defendant Oluwole Ojudun appeals from a judgment of the United States District Court for the Southern District of New York, Katherine B. Forrest, then-*Judge*, revoking his supervised release--imposed following his prior conviction for conspiracy to commit bank fraud, in violation of 18 U.S.C. §§ 1344 and 1349--on the grounds that Ojudun violated standard conditions of release by (1) committing forgery in violation of New Jersey law, (2) committing theft by deception in violation of New Jersey law, (3) leaving the judicial jurisdiction of his supervision without

3

permission, and (4) associating with a known felon. The court ordered Ojudun to serve 30 months' imprisonment, followed by two years of supervised release, to be served consecutively to any state sentence that may be imposed. On appeal, Ojudun challenges his convictions on charges (1), (2), and (4), contending principally that the court erred (a) in denying his motion to suppress, on Fourth Amendment grounds, evidence resulting from the New Jersey police officers' stop of the vehicle in which he was a passenger, and (b) in admitting, over his motion to preclude as hearsay, evidence of postarrest statements made about Ojudun by the vehicle's driver. For the reasons that follow, we reject Ojudun's challenges to the officers' stop of the vehicle and the ensuing seizure of evidence. However, we conclude that statements of the driver that incriminated Ojudun without incriminating the driver were not properly, under Rule 804(b)(3) of the Federal Rules of Evidence, ruled statements against the interest of the driver, and that the district court did not perform the analyses required under Rule 804(b)(3)(B) or under Rule 32.1(b)(2)(C) of the Federal Rules of Criminal Procedure, in order to determine the admissibility of the declarant's other statements. We thus vacate the judgment and remand for further proceedings.

## I. BACKGROUND

The present proceeding against Ojudun alleging his violations of supervised release ("VOSR") arises from the January 12, 2017 stop by local police officers in Summit, New Jersey, of a car (the "Car") driven by Anthony Gray, in which Ojudun was a passenger. Ojudun moved to suppress any evidence resulting from the stop, contending that the stop, the ensuing search of the Car, and his arrest, violated the Fourth Amendment. As part of Ojudun's VOSR hearing, which was held in April and June 2017, the stop and its aftermath were described principally in a suppression hearing at which the only witness was Detective Christopher Medina of the Summit Police Department ("SPD"), who had participated in the stop, the search, and the subsequent arrests of Ojudun, Gray, and Jerry Cesaro, the Car's other passenger (*see* Part I.B. below). Medina also described his postarrest interview of Gray. That testimony and a videotape of the interview were introduced over Ojudun's hearsay objection (*see* Part I.C. below).

Following the hearing, the district court, *inter alia*, found the testimony of Medina to be credible and found that his observations of the Car and Cesaro provided reasonable suspicion sufficient to justify the stop of the Car. Ojudun has not

argued that any of the court's factual findings in this regard are clearly erroneous; rather, he challenges its conclusions of law as to the constitutionality of the stop of the Car and the ensuing search and seizures. He also challenges the court's ruling that Gray's hearsay statements were admissible under Fed. R. Evid. Rule 804(b)(3), the exception for statements that are contrary to the declarant's punitive interest.

A. *Ojudun's Prior Conviction*

Relevant events leading to Ojudun's prior conviction are not disputed and/or are matters of record. In 2011, the United States Postal Inspection Service began investigating a bank fraud scheme that involved deposits of counterfeit checks at banks located in New York, New Jersey, and Connecticut. Some scheme participants would open bank accounts using their own identities and would provide their account information and personal identification numbers to other participants, who would then deposit counterfeit checks into the accounts. Thereafter, participants would obtain money from the accounts by withdrawing cash at Automated Teller Machines ("ATMs"), or using debit cards at retail locations, or purchasing money orders at United States Post Offices.

Ojudun and Gray were among the participants in the scheme. Ojudun deposited counterfeit checks and withdrew cash from ATMs and local bank branches, and he recruited others to do so. Gray supplied scheme participants with counterfeit checks and drove them to various banks in order to cash them.

In 2012, Gray, following his plea of guilty, was convicted of bank fraud. He was sentenced principally to time served, plus three years of supervised release. In 2014, Ojudun was convicted, following his plea of guilty, of conspiracy to commit bank fraud. He was sentenced to 40 months' imprisonment, to be followed by three years of supervised release. Ojudun's three-year supervised-release term began upon his release from prison in May 2016.

B. *SPD's January 2017 Stop of the Car and Arrest of Ojudun*

Medina's testimony at the suppression hearing included the following.

1. *The Stop*

Around noon on January 12, 2017, Medina and SPD Detective Sergeant Mike Treiber (the "Officers") were driving in the center of Summit, a town in which the vast majority of the cars were registered in New Jersey, when they noticed the

7

Car, a black BMW with New York license plates, drive about 100 feet past a Chase Bank branch and double park. (*See* Hearing Transcript, April 19, 2017 ("April Tr."), at 20-24.) A "disheveled looking" white male--later identified as Cesaro--whose gaunt face, dirty clothing, and general appearance were, in Medina's experience, "consistent with somebody who uses drugs" (*id.* at 24), exited the Car, "meander[ed]" toward the bank, walking diagonally in the street rather than crossing and using the sidewalk (Hearing Transcript, June 16, 2017 ("June Tr."), at 44; *see id.* at 50-51), and entered the rear door to the bank (*see* April Tr. 29). The Car drove off; the Officers, whose suspicions were aroused as to the possibility of bank fraud or narcotics trafficking, promptly parked in the first parking spot in the bank's parking lot--one of several available spaces--and watched the bank's rear entrance. They saw Cesaro exit the bank, and at about the same time saw the Car reappear and again drive about 100 feet past the bank, and stop. Cesaro, again walking diagonally in the street rather than crossing to use the sidewalk, entered the Car, which drove off after remaining stationary for some 30-60 seconds. (*See id.* at 28-31; June Tr. 55-58.)

The Officers followed for a time, then signaled the Car to pull over and stop.

2. *The Questioning, the Search, and the Arrests*

After the Car stopped, Medina went to the passenger side, identified himself as an SPD detective, and asked the driver--Gray--for credentials. Gray produced a registration, an insurance card, and his driver's license, but as he was rummaging for the documents, Medina asked how the men had wound up in Summit; Gray responded that they had taken a wrong exit and had gotten lost trying to go to the mall in nearby Short Hills, New Jersey. (*See* April Tr. 36; June Tr. 78.) Medina then asked how they all knew each other; Gray said the front seat passenger-- who was Ojudun--was his friend and that the back seat passenger was his "uncle." (April Tr. 36.) But when Medina asked what Gray's uncle's name was, Gray just said "What?" which Medina's training and experience caused him to view as a stalling tactic--a view enhanced by Cesaro's appearance and his odd path to and from the bank, as well as by the driver's failure to avail himself of any of the empty spaces in the bank's parking lot or to stop in front of the bank to drop Cesaro off or pick him up, instead of twice proceeding 100 feet past the bank. Upon Gray's apparently evasive response, Medina told Cesaro to get out of the Car.

Medina took Cesaro to the rear of the Car and attempted to have him place his hands on the rear of the Car. Cesaro instead resisted, kept one hand in his

9

pocket, and elbowed Medina in the ribs. Medina grabbed Cesaro and threw him to the ground. While subduing Cesaro, Medina saw the Car's brake lights flare and, fearing that the Car was about to either flee or back over him, yelled a warning to Treiber. Treiber pulled his pistol and pointed it toward Gray, telling him to turn off the engine, and summoned backup police officers.

When more officers arrived a few minutes later, Treiber holstered his gun, and Gray and Ojudun were taken out of the Car. Cesaro was placed under arrest for assaulting Medina and was searched incident to that arrest. (*See* June Tr. 17.) In Cesaro's pockets, Medina found, *inter alia*, the remnants of a crack pipe that had broken when Cesaro was taken to the ground; a credit card in the name of one Frank Langendorf (*see id.* at 26); a New York State prison inmate identification card bearing Cesaro's name and picture (*see* April Tr. 40-41); and a Pennsylvania driver's license in Langendorf's name but bearing a picture of Cesaro (*see id.* at 41). One of the backup SPD officers took a cell-phone photograph of Cesaro and went into the bank with it to determine what Cesaro had done there.

Meanwhile, Medina asked Gray, as the Car's driver, whether he would consent to a search of the Car. Neither Gray nor Ojudun had been arrested at this point. (*See* June Tr. 17.) Gray gave his consent.

10

When, in a normal speaking voice, Medina asked Gray for consent to search the Car, Ojudun--seated on the curb at the rear of the car--was no more than five feet away; and at no point did Ojudun reveal that the Car belonged to his girlfriend, or state that Gray was not authorized to drive it or to consent to its search, or say that Ojudun himself objected to the search. After Gray gave his consent, Medina, at the rear of the car to search the trunk, told Gray that he could have the search halted at any time if he chose. Ojudun, still seated on the curb at the rear of the Car, said nothing. (*See* June Tr. 18-19.) No one present suggested that Gray lacked authority to consent to a search. (*See id.* at 19; April Tr. 44-46.)

In searching the Car, officers immediately found, on the seat that had been occupied by Ojudun, an envelope containing two checks made payable to Frank Langendorf. (*See* June Tr. 18.) In the meantime, the officer who had taken Cesaro's picture to show to bank employees learned that Cesaro had cashed a $2,845.46 check that was payable to Frank Langendorf and had displayed a Pennsylvania driver's license in that name. (*See id.* at 19-21.) Based on the discovery of the two Langendorf checks on Ojudun's seat and the information provided by the bank as to the Langendorf check just cashed by Cesaro, the officers then "placed everybody under arrest." (*Id*. at 24-25.)

When Ojudun was searched incident to his arrest, the officers found that he had cash in two pockets. In one, he had $233 in worn bills that looked to have been in circulation for some time. (*See id.* at 25-26.) In the other, he had fresh bills totaling exactly $2,845. (*See id.* at 25.)

In the continuing search of the Car, officers found in the center console an envelope containing pedigree information for Langendorf. They also found a paper that contained "what looked to be practicing of signatures of Mr. [F]rank Langendorf which matched the endorsed portion of the check cashed by Mr. Cesaro." (June Tr. 26). SPD officers contacted the police department in nearby Millburn, New Jersey, where Langendorf resided, and learned that he had several times complained of identity theft. Millburn police arrived at the scene of the arrests in Summit and confirmed that the occupants of the Car possessed information belonging to the real Frank Langendorf.

C. *Gray's Postarrest Statements Incriminating Ojudun*

At SPD headquarters, Medina conducted an interview of Gray, which was videotaped. As described in greater detail in Part II.B. below, after initially denying all knowledge of a fraud scheme, Gray eventually admitted that he had been

12

promised $100 by Cesaro to drive Ojudun and Cesaro to the bank in order to cash a check. Gray said he saw Ojudun give the check to Cesaro to take into the bank.

Although Gray had waived his *Miranda* rights for the interview, it was established at the VOSR hearing that he would be unavailable to testify because of his assertion of his Fifth Amendment privilege against self-incrimination. (*See* June Tr. 4-5.) Ojudun moved to exclude any evidence as to Gray's statements as hearsay.

D. *The District Court's Rulings*

1. *On the Challenge to the Stop*

At the close of the June hearing, the district court denied Ojudun's motion to suppress evidence seized as a result of the stop of the Car. It found Medina's testimony to be "very credible" and concluded, based on the totality of the circumstances, that the "accumulation of facts" resulting from the Officers' observations of, *inter alia*, the unusual movements of the Car and of Cesaro--described in Part I.B.1. above--provided a "very solid basis" for reasonable suspicion to support the initial stop of the Car. (June Tr. 108). The court stated that its conclusion was "not based upon one fact but based upon an accumulation of facts . . . in their totality . . . ." (*Id*. at 108-09.)

13

## 2. *On the Challenge to the Search for Lack of Consent*

Just prior to the start of the suppression hearing, Ojudun filed a declaration challenging the government's position that there had been a valid consent to search the Car. Ojudun presented evidence that the Car belonged to his girlfriend, stated that he had not consented to the search, and offered to call his girlfriend to testify that she had not authorized Gray to drive her car or to consent to its search. The government conceded with respect to ownership and the fact that the owner and Ojudun did not give consent. (*See* April Tr. 13.) The district court noted that the question remained whether Gray had apparent authority to consent to a search and whether it was reasonable for the Officers to believe he had authority.

After the suppression hearing, the court found "no information to suggest that Gray was not in control of the vehicle and didn't have apparent authority over [it]." (June Tr. at 110.) Even though Gray was not the Car's owner, the court found that he had apparent authority and control over it, as he was driving it when it was first seen stopping at the bank, when it had rounded the block and returned to the bank, and when it was driven away after picking up Cesaro. Although Medina could have learned by examining the Car's registration that it belonged to someone other than Gray, the court concluded that that information would not have dispelled

14

the appearance that Gray was authorized to drive and exercise control over the Car. Gray gave Medina the requested documents (*see*, *e.g.*, Ojudun brief on appeal at 22 (the Car's registration "w[as] immediately handed over")) without providing any indication that he did not have permission or authority to use or exercise dominion over the Car. And when requested, he promptly gave his consent to the search, giving no indication that he lacked authority to do so.

Ojudun himself during the events of January 12 made no mention of the fact that the Car was owned by his girlfriend; he did not in any way indicate that Gray lacked permission to drive the Car, or to exercise full authority over it, or to consent to its search. The district court found that Ojudun "was in sufficient proximity" to hear, *inter alia*, both Medina's request that Gray consent to a search and Medina's ensuing statements to Gray that, even having given his consent, Gray could have the search terminated at any time; the court found that "there was no[] suggestion by . . . Ojudun or anyone that Mr. Gray did not have authority to consent to search . . . ." (June Tr. 113.) The court concluded that Medina had reasonably relied on Gray's apparent authority to consent to the vehicle search. (*See id.* at 110-13; June 23, 2017 Endorsement Order confirming oral ruling.)

15

3. *The Admission of Gray's Postarrest Statements*

At the start of the June session of the VOSR hearing, the district court denied Ojudun's motion to exclude evidence of Gray's interview statements to Medina. The court ruled that all of Gray's statements were within the Rule 804(b)(3) exception for statements against the declarant's penal interest. (*See* Part II.B. below.)

## II. DISCUSSION

On appeal, Ojudun contends that the district court erred (A) in denying his Fourth Amendment motion to suppress on the grounds that the Officers lacked reasonable suspicion to stop the Car and that Gray lacked authority to consent to the search, and (B) in concluding that Gray's hearsay statements incriminating Ojudun were admissible under Rule 804(b)(3) as statements against Gray's interest. We reject Ojudun's Fourth Amendment contentions but find merit in his Rule 804(b)(3) challenge.

A. *The Fourth Amendment Challenges to the Stop and the Search*

Ojudun's contentions that the district court erred in rejecting his Fourth

Amendment challenges to the stop and search of the Car do not require extended discussion. In considering challenges to the denial of a suppression motion, we review the district court's factual findings for clear error and its conclusions of law *de novo*. *See*, *e.g.*, *United States v. Medunjanin*, 752 F.3d 576, 584 (2d Cir.), *cert. denied*, 135 S. Ct. 301 (2014). Ojudun has not argued that any of the court's factual findings described in Part I.D. above are clearly erroneous; and we see no error of law.

It is well established that, consistent with the Fourth Amendment, a "government law enforcement agent may subject an individual to an investigative stop upon a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity. . . . The agent is said to have a reasonable suspicion when he is in possession of 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion.'" *United States v. Villegas*, 928 F.2d 512, 516 (2d Cir. 1991) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)); *see generally United States v. Brignoni-Ponce*, 422 U.S. 873, 884-86 (1975) (the interception of a moving vehicle, causing it to stop for questioning, is not so intrusive that probable cause is required, so long as it is supported by specific articulable facts that, together with rational inferences from those facts, reasonably warrant suspicion that the vehicle contains persons who are engaging in or are about to engage in

17

unlawful activity). The "touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). "Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996).

As described in Part I.D.1. above, the district court applied these principles in evaluating the Officers' assessment of their observations of the unusual conduct described in Part I.B. above. We see no error in the court's conclusion that the stop of the Car was supported by reasonable suspicion, and we affirm the denial of Ojudun's challenge to the stop substantially for the reasons stated by the district court.

Although Ojudun makes an additional argument that the record does not support a finding that the Officers had reason to stop the Car for a violation of local traffic laws, we need not address that argument, as the district court sufficiently rested its decision on the ground described above.

It is also well established that the Fourth Amendment does not forbid a warrantless search of private property pursuant to consent, voluntarily given, by the owner of the property, *see, e.g.*, *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973), or by "another person who has authority to consent by reason of that person's 'common

authority over or other sufficient relationship to the premises,'" *United States v. McGee*, 564 F.3d 136, 138 (2d Cir. 2009) ("*McGee*") (quoting *United States v. Matlock*, 415 U.S. 164, 171 (1974)), or by a person who in fact lacked authority to consent but who "reasonably appeared to the police to possess authority to consent to the search," *McGee*, 564 F.3d at 139. The requirement imposed by the Fourth Amendment's touchstone of reasonableness "is not that the[ officers] always be correct, but that they always be reasonable." *Illinois v. Rodriguez*, 497 U.S. 177, 185-86 (1990). Thus, where the person who gave consent did not have actual authority, the question is "whether the officers reasonably believed that [he] had the authority to consent." *Id.* at 189.

In challenging the district court's conclusion that Gray had apparent authority to consent to the search of the Car and that it was reasonable for the Officers to believe that he had authority, Ojudun argues that "no reasonable officer in Medina's position would have assumed that Gray had . . . authority" to consent to a search (Ojudun brief on appeal at 22); but he points to no evidence other than the fact that the Car's registration was in a name other than that of Gray. While Ojudun states that "Gray had only temporary access to the vehicle, . . . could not regularly access the vehicle, . . . and did not have permission to drive the vehicle" (*id.*), not one of those limitations was observable by the Officers, and, as the district court found (*see* Part

19

I.D.2. above), none was hinted at by Ojudun on January 12. Gray was the only person the Officers observed driving the Car; when asked for license and registration, Gray "immediately handed [them] over" (Ojudun brief on appeal at 22); and although Gray's consent to search the car was requested and discussed within earshot of at least Ojudun, none of the occupants of the car suggested in any manner that Gray, the driver, lacked authority to consent to a search. We conclude that the district court did not err in ruling that it was reasonable for the Officers to believe that Gray had such authority.

B. *The Challenge to the Admission of Gray's Postarrest Statements*

Gray's postarrest interview by Medina was some 27 minutes long. At the beginning, Gray claimed that he had come to New Jersey simply to visit an outlet at the Short Hills mall that sold new or lightly used sneakers. For approximately the first half of the interview, Gray denied his involvement in any fraudulent scheme and persisted in proclaiming that single benign purpose. However, as Medina testified, Gray eventually conceded "that he knew that they were leaving the Bronx to come to that bank and that they were going to cash the check" (June Tr. 32).

1. *Gray's Videotaped Statement*

The videotape reveals that Gray said he became the driver for the January 12 trip because he was a professional driver and preferred driving to being driven. And although he said he had never heard of Ojudun or Cesaro engaging in fraudulent banking activity before, Gray eventually admitted that he had known from the start of the trip that Ojudun's and Cesaro's intentions were to cash a check at the bank in Summit. (Gray also said near the start of the interview that he had never been involved previously in any activity of this sort; but toward the end he admitted that he had previously been "arrested" for this kind of conduct. *See generally* Part I.A. above.) Gray said that Ojudun had called him on the morning of January 12 to make plans to drive to New Jersey, that Ojudun already had possession of Ojudun's girlfriend's car, and that Cesaro promised to pay Gray $100 to drive.

Gray said he knew when he got into the Car that the plan was to go to Summit to cash a check. He said, however, that he had no conversation with Ojudun or Cesaro as to the banking aspects of the trip; that he did not participate in selecting the bank at which the check would be cashed and did not know why the bank in question had been chosen; that he did not know the source of the checks or how many such checks were in the Car; that he did not know the provenance of Cesaro's

21

identification; that he did not know how much money Cesaro or Ojudun respectively would receive from the check; and that he did not see, or know that, Cesaro gave Ojudun money from the cashed check.

Gray said that when he stopped the Car to let Cesaro get out to go to the bank, he saw Ojudun give Cesaro a check. Gray said he did not know exactly what Cesaro was going to do in the bank once Gray dropped him off, although he knew the general plan was to cash a check. Gray said he was not paying close attention to the scheme because his principal purpose in driving to Summit was to look at sneakers at the mall. He said he only knew they were to go to the mall after the check was cashed.

2. *The District Court's Ruling*

Over Ojudun's objection that the evidence of Gray's statements was hearsay, the district court admitted the videotaped interview, and Medina's description of it, ruling that it fell within Fed. R. Evid. 804(b)(3)'s exception for statements against the declarant's punitive interest. The court reasoned as follows:

> When somebody is sitting there, while it is true that Mr. Gray starts off talking to the interviewing officer and pushing back about any involvement, eventually, *he concedes involvement, though he does, I agree, try to push more involvement off on others than he*

22

*accepts for himself.* But he puts himself there and *he starts to concede some of the relevant facts.* That at the very least is a statement against interest for a conspiracy claim. So it doesn't have to be what is actually charged for it to be a statement against interest but he is putting himself in the vicinity and in the circumstances where he's driving *somebody* in this car cause he knows how to *drive to a location where he understands there's going to be bank fraud.* So now while he may say, hey, I wasn't the really, the bad doer-- and I'm summarizing . . . . [t]hat is a statement certainly against his interest. He could not have thought that that statement was something that could not result in a potential criminal penalty. Perhaps a lesser criminal penalty than others might have suffered or feared but a statement as against interest can be construed at the level of a violation. But here we are not even talking about that. We're talking some form of criminal conduct that would be well above that level.

(June Tr. 5-6 (emphases added).)

Although a district court's decision to admit evidence is reviewed for abuse of discretion, *see, e.g., United States v. Saget*, 377 F.3d 223, 231 (2d Cir. 2004) ("*Saget*"), *cert. denied*, 543 U.S. 1079 (2005); *United States v. Jones*, 299 F.3d 103, 112 (2d Cir. 2002); *United States v. Tocco*, 135 F.3d 116, 127 (2d Cir. 1998), the court "abuses or exceeds the discretion accorded to it when (1) its decision rests on [(a)] an error of law (such as application of the wrong legal principle) or [(b)] a clearly erroneous factual finding, or (2) its decision . . . cannot be located within the range of permissible decisions," *Jones*, 299 F.3d at 112 (internal quotation marks omitted). In light of the

23

following legal principles, we have several difficulties with the court's decision in this case.

3. *Statements Against Penal Interest*

Rule 804 provides that the hearsay rule does not exclude evidence of a statement against an unavailable declarant's penal interest if the

> statement [is one] that:
>
> **(A)** a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it . . . had so great a tendency . . . to expose the declarant to . . . criminal liability; and
>
> **(B)** is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Fed. R. Evid. 804(b)(3). The threshold questions are whether the offered "statement" of the declarant would be perceived by "a reasonable person in the declarant's shoes" to be "detrimental to his or her own penal interest," *Saget*, 377 F.3d at 231.

First, although the word "statement" might be read broadly to refer to a declarant's "entire confession," *Williamson v. United States*, 512 U.S. 594, 599 (1994), it must instead, in light of the principles underlying the Rule, be construed to refer to, and to require assessment of, each assertion individually, *see id.* at 600-01.

24

*Rule 804(b)(3) is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true.* This notion simply does not extend to the broader definition of "statement.*" The fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts.* One of the most effective ways to lie is to mix falsehood with truth . . . .

*Id.* at 559-600 (emphases added). Thus,

[*t*]*he district court may not just assume for purposes of Rule 804(b)(3) that a statement is self-inculpatory because it is part of a fuller confession*, and *this is especially true when the statement implicates someone else.* "[T]he arrest statements of a codefendant have traditionally been viewed with special suspicion. Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence.*"

*Williamson*, 512 U.S. at 601 (quoting *Lee v. Illinois*, 476 U.S. 530, 541 (1986) (emphases ours)).

Second, as to any particular statement, "[t]he question under Rule 804(b)(3) is always," in light of all surrounding circumstances, "whether the statement was sufficiently against the *declarant's* penal interest that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." *Id.* at 603-04 (internal quotation marks omitted) (emphasis added). Thus, while some parts of a declarant's statement may be clearly self-incriminatory, "other parts, . . .

especially the parts that implicated [the defendant, and] did little to subject [the declarant] himself to criminal liability," are not within the scope of Rule 804(b)(3)(A). *Id.* at 604; *see id.* ("*A* reasonable person in [the declarant's] position might even think that implicating someone else would decrease his practical exposure to criminal liability, at least so far as sentencing goes. Small fish in a big conspiracy often get shorter sentences than people who are running the whole show, . . . especially if the small fish are willing to help the authorities catch the big ones."). Accordingly, the court must "inquire[] whether *each* of the statements in [the declarant's] confession was *truly self-inculpatory*." *Id.* (emphases added). A particular statement by the declarant is not within "the penal interest exception" if it incriminated the defendant "exclusively." *United States v. Wexler*, 522 F.3d 194, 202-03 (2d Cir. 2008).

In light of these principles, we have several difficulties with the district court's treatment of the Gray interview. First, the court did not focus on each of his statements individually to determine which of them would reasonably have been viewed as so exposing him to criminal liability as to fall within Rule 804(b)(3)(A). Rather, as shown above, the court commented generally on Gray's statement as a whole. To be sure, several of his statements were plainly contrary to his own penal interest. He admitted--eventually--that he knew when he got into the Car at the start

26

of the trip that the plan was to go to the bank in Summit to cash a check, and he admitted that he was going to be paid $100 by Cesaro to drive Ojudun and Cesaro there. These statements were contrary to Gray's punitive interest, as the district court correctly noted that admitting to "driving *somebody* in this car . . . to a location where he understands there's going to be bank fraud" (June Tr. 5 (emphasis added)) provided evidence that could lead to Gray's conviction for conspiracy to commit financial fraud. The fact that these statements also tended to implicate Ojudun, who had procured the Car, and Cesaro, who had cashed the check, did not lessen their detriment to Gray's interest because his statement was evidence of his foreknowledge of and assistance in the commission of the crime. But these statements were but a small part of Gray's overall interview.

Second, the court did not at all address the Gray statement that was most damaging to Ojudun, Cesaro having been the person who promised Gray $100 and physically cashed the counterfeit check. Gray said that when he stopped the Car to let Cesaro out to go to the bank, Ojudun gave Cesaro the check. This was a statement that tied Ojudun squarely to the execution of the fraud, without in any way further implicating Gray. We cannot say that this statement fell within the scope of Rule 804(b)(3)(A).

27

Third, even where the court has properly found that a particular statement is against the declarant's own penal interest within the meaning of Rule 804(b)(3)(A), the court must then determine whether there are "corroborating circumstances that clearly indicate," Fed. R. Evid. 804(b)(3)(B), "both the declarant's trustworthiness and the truth of the statement," *United States v. Lumpkin*, 192 F.3d 280, 287 (2d Cir. 1999). For those conditions to be satisfied, "the inference of trustworthiness from the proffered 'corroborating circumstances' must be strong, not merely allowable." *United States v. Salvador*, 820 F.2d 558, 561 (2d Cir.), *cert. denied*, 484 U.S. 966 (1987).

Here, most of Gray's statements, made to a law enforcement official, were designed to minimize his involvement in the planned fraud and to deflect responsibility onto Ojudun and Cesaro. Even after he abandoned his initial claim of total innocence, he claimed, as detailed in Part II.B.1. above, total ignorance about, *inter alia*, bank selection, the presence of counterfeit checks in the Car, cash in the Car, provenance of fraudulent identifications, division of proceeds, and the source of the checks. The thrust of Gray's statements, once Medina persuaded him that it would be in his interest to abandon his claim of innocence, was that he knew Ojudun and Cesaro planned to cash a check. The record does not indicate that the district court

28

made any inquiry as to whether there were corroborating circumstances to indicate clearly that such of Gray's statements as fell within Rule 804(b)(3)(A) were trustworthy to the extent that they were made to a law enforcement official and sought to deflect responsibility onto Ojudun.

In sum, we conclude that the district court, in holding Gray's entire set of statements to be within the scope of Rule 804(b)(3), erred in failing to make a particularized assessment of the various individual assertions, in failing to determine whether the relevant assertions were sufficiently corroborated as required by Rule 804(b)(3)(B), and in failing to recognize that the Gray statement that was most damaging to Ojudun was not within Rule 804(b)(3) because it did not implicate Gray at all.

Although the government contends that any error with respect to the admission of Gray's post-arrest statement was harmless, we disagree. The district court stated that "[t]he post arrest statement of Mr. Gray indicates that Mr. Gray knew that the check would be given from Mr. Ojudun to Mr. Cesaro and that Mr. Cesaro then we know as a matter of fact exited the vehicle, went into the bank and passed the check." (June Tr. 114.) In view of the district court's reliance on a portion of Gray's

statement that was not against his penal interest, the error under Rule 804(b)(3) was not harmless.

Accordingly, we vacate the judgment and remand for the court to conduct the required particularized analyses. The court should determine which of Gray's statements could properly be admitted under Rule 804(b)(3), and in light of the admissible evidence, determine whether the VOSR charges against Ojudun have been established by a preponderance of the evidence.

**4.** *Rule 32.1 of the Federal Rules of Criminal Procedure*

Finally, we note that, as to such of Gray's statements as are not within the scope of Evidence Rule 804(b)(3), the court may consider whether they may properly be admitted instead pursuant to Rule 32.1(b)(2)(C) of the Federal Rules of Criminal Procedure. While the Sixth Amendment right of confrontation that is applicable in a criminal trial does not apply in a proceeding for probation revocation, parole revocation, or revocation of supervised release because such a proceeding "is not a stage of a criminal prosecution," *United States v. Aspinall*, 389 F.3d 332, 342 (2d Cir. 2004) ("*Aspinall*") (supervised release) (internal quotation marks omitted), *abrogated*

30

*on other grounds by United States v. Fleming*, 397 F.3d 95, 99 n.5 (2d Cir. 2005); *see*

*Morrissey v. Brewer*, 408 U.S. 471, 480 (1972) (parole); *Gagnon v. Scarpelli*, 411 U.S. 778,

782 (1973) (probation), the accused in such a revocation proceeding enjoys certain

protections under principles of due process, such as "the right to confront and cross-

examine adverse witnesses (unless the hearing officer specifically finds good cause

for not allowing confrontation)," *Morrissey*, 408 U.S. at 489.

This more limited right of confrontation is embodied in the Criminal

Rules provision that the defendant in a revocation hearing "is entitled to . . . an

opportunity to . . . question any adverse witness unless the court determines that the

interest of justice does not require the witness to appear." Fed. R. Crim. P.

32.1(b)(2)(C). The balancing analysis envisioned by this Rule "need not be made

where the proffered out-of-court statement is admissible under an established

exception to the hearsay rule." *Aspinall*, 389 F.3d at 344; *see, e.g., Jones*, 299 F.3d at 113.

But for statements that would be inadmissible as hearsay under the Federal Rules of

Evidence, determinations as to good cause and the interests of justice "require[] the

court to balance the defendant's interest in confronting the declarant against . . . the

government's reasons for not producing the witness and the reliability of the

proffered hearsay." *United States v. Carthen*, 681 F.3d 94, 100 (2d Cir. 2012) (internal quotation marks omitted), *cert. denied*, 568 U.S. 1092 (2013).

CONCLUSION

We have considered all of parties' arguments in support of their respective positions on this appeal and, except to the extent indicated above, have found them to be without merit. The judgment is vacated, and the matter is remanded for proceedings consistent with the foregoing.